793 A.2d 792 (2002)
349 N.J. Super. 352
STATE of New Jersey, Plaintiff-Respondent,
v.
ONE 1994 FORD THUNDERBIRD, New Jersey Reg. No. VY923Y, VIN 1FALP62WORH143581 and Four Thousand Six Hundred Dollars in United States Currency, Defendant.
In the Matter of Sigilfred Ortiz, Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 14, 2002.
Decided March 21, 2002.
*794 Norman A. Doyle, Jr., Kearny, argued the cause for appellant (Doyle & Brady, attorneys; Mr. Doyle, on the brief).
Peter Boser, Assistant Prosecutor, argued the cause for respondent (John Kaye, Monmouth County Prosecutor, attorney; Mr. Boser, on the brief).
Before Judges HAVEY, BRAITHWAITE, and WEISSBARD.
*793 The opinion of the court was delivered by WEISSBARD, J.A.D.
In this civil forfeiture action arising out of claimant's arrest and prosecution for possession of a controlled substance, we are called upon to determine the standard which governs warrantless searches of vehicles impounded for possible forfeiture. Although there are decisions, primarily from the federal courts, granting an unfettered right to search under such circumstances, we reject that rule and hold that searches of vehicles impounded in contemplation of forfeiture are to be judged by the rules governing inventory searches. See State v. Mangold, 82 N.J. 575, 414 A.2d 1312 (1980). In this case, we conclude that a search of the trunk of claimant's vehicle did not meet the inventory search requirements and that, as a result, $3910 found secreted therein must be suppressed.[1] Because of our holding, we remand the case for a determination as to whether forfeiture of other currency found within the passenger compartment of the vehicle and the vehicle itself are subject to forfeiture without consideration of the illegally seized currency.
Claimant, Sigilfred Ortiz, appeals from a final judgment ordering forfeiture to the State of a 1994 Ford Thunderbird and two separate bundles of currency found within the automobile. The vehicle and $700 were forfeited as a result of a summary judgment on July 9, 1999 and $3910 was forfeited after a plenary hearing on September 25-26, 2000. As noted, we reverse as to the $3910 and remand for further proceedings as to the $700 and vehicle.
The events leading to the forfeiture began on July 9, 1998 when Ortiz, operating the Thunderbird southbound on the Garden State Parkway, was stopped for speeding by Trooper Dreher of the New Jersey State Police. A passenger, Henry Fallas, was also in the vehicle. As Dreher approached the driver's side of the car and requested credentials, he "immediately detected *795 the faint odor of raw marijuana emanating from the interior of the vehicle."
Ortiz produced his license and told Dreher that he and Fallas were returning from work; however, Ortiz was unable to specify the location. Fallas also said that they were coming back from work. Dreher asked Ortiz if he had ever been arrested and Ortiz stated that he was previously "arrested for drug charges."[2] Dreher then told Ortiz that he smelled an odor of marijuana, but Ortiz stated that he didn't "have anything in the vehicle." Dreher presented a consent to search form to Ortiz, explained the form, and informed Ortiz of his right to refuse the consent. Ortiz read and voluntarily signed the consent form. Dreher ordered both Ortiz and Fallas to exit the car.
Ortiz and Fallas sat on the hood of the car while Dreher searched the interior. Dreher found "greenish brown vegetation" in the right door pocket compartment that he suspected to be marijuana, a white paper fold containing four white tablets containing the marks of swans, and a clear plastic baggie containing seventeen white tablets with the marks of swans. The tablets were found in the center console, underneath the ashtray, next to the gear shift. Dreher suspected the tablets to be Ecstasy.[3] Dreher also found $700 in U.S. currency in a day planner on the floor of the vehicle. The $700 was "stacked in multiple twenty dollar folds in groups of fifty dollar stacks."
Ortiz admitted the drugs were his. Dreher arrested Ortiz for possession of Ecstasy and marijuana, read him his Miranda[4] rights, handcuffed Fallas, and brought them to the Holmdel Police Station for processing. Ortiz was charged with possession of a controlled dangerous substance (CDS), Ecstasy, possession of CDS, marijuana less than 50 grams, and was advised that the vehicle and the $700 were being held pending forfeiture proceedings. After Ortiz repeated that the drugs were his and that Fallas had no knowledge of the drugs, Fallas was released. Ortiz was then released into his mother's custody.
On July 10, 1998, Detective Scott Cholewa of the Monmouth County Prosecutor's Office reported to the Holmdel station and took possession of the $700 and the Ford Thunderbird. The vehicle was taken to the County Prosecutor's impound yard where, on July 13, 1998, Cholewa conducted a "seized vehicle inventory." Cholewa searched the vehicle's trunk, where he found some articles of clothing and sneakers; Cholewa tossed one of the sneakers to the side of the trunk causing a large bundle of cash that had been secreted in the toe area of the sneaker to become visible. Cholewa testified that the money in the trunk was bundled and fastened by a rubber band. The cash totaled $3910.
Ortiz subsequently pled guilty to possession of Ecstasy and was sentenced to probation.
On September 24, 1998, the State filed a verified petition for forfeiture of the automobile, the $700, and the $3910. Ortiz filed an answer asserting that the car and the money were possessed lawfully and further alleging that the several searches of the car were unconstitutional.
*796 Thereafter Ortiz sought summary judgment and suppression of the money seized in the search of the vehicle's trunk. The State cross-moved for summary judgment in its favor. On July 12, 1999, the motion judge granted the State's application for forfeiture as to the automobile and the $700. A trial was ordered with respect to the $3910 found in the trunk.
After a trial on September 25-26, 2000, the judge issued a written decision dated December 21, 2000 granting forfeiture of the $3910.[5]
On appeal, Ortiz raises separate challenges to the forfeiture of: (1) the $700 found inside the car; (2) the vehicle itself; and (3) the $3910 found in the trunk. With respect to the third contention, he also contests the legality of the search of the trunk which led to the seizure of the $3910. Because it affects our resolution of the remaining issues, we deal first with the validity of the search.

I.
The permitted scope of a search of a vehicle seized in contemplation of forfeiture has never been decided by our courts. In a thoughtful opinion, the trial judge held that the warrantless search of the Thunderbird's trunk, which resulted in seizure of the currency found in a sneaker, was permissible under an exception to the general rule that all searches conducted without a warrant are prima facie invalid. State v. Hill, 115 N.J. 169, 173, 557 A.2d 322 (1989) (listing eleven exceptions recognized by the United States Supreme Court). On appeal, the State argues for the same rule. Ortiz contends that the search should be judged by rules governing "inventory" searches. See Mangold, supra. The trial judge found Mangold "not controlling" because the vehicle in this case was not simply impounded but, rather, seized for forfeiture.
As the trial judge noted, analysis of the issue begins with the Supreme Court's decision in Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) (4-3 decision). In that case, state officers impounded an automobile based on evidence that it had been used in narcotics possession and transportation. The officers were required to keep the car "as evidence" until forfeiture proceedings were concluded. Id. at 60, 87 S.Ct. at 790, 17 L.Ed.2d at 730. The officers searched the car a week after the defendant's arrest, finding evidence which formed the basis for a conviction. The Supreme Court stated:
Here the officers seized petitioner's car because they were required to do so by state law. They seized it because of the crime for which they arrested petitioner. They seized it to impound it and they had to keep it until forfeiture proceedings were concluded. Their subsequent search of the carwhether the State had "legal title" to it or notwas closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained. The forfeiture of petitioner's car did not take place until over four months after it was lawfully seized. It would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it. It is no answer to say that the police could have obtained a search warrant, for "[t]he relevant test is not whether it is reasonable to procure a *797 search warrant, but whether the search was reasonable." Under the circumstances of this case, we cannot hold unreasonable under the Fourth Amendment the examination or search of a car validly held by officers for use as evidence in a forfeiture proceeding.
[Id. at 61-62, 87 S.Ct. at 791, 17 L.Ed.2d at 733-34 (citations omitted).][6]
The interpretation of this critical language has not been uniform. In an exhaustive discussion in United States v. Johnson, 572 F.2d 227, 230 (9th Cir.1978), cert. denied, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978), Judge Wright perceptively noted that the "rationale of Cooper is unclear." He went on to pose the issue as follows:
It is debatable whether the Cooper search was validated because it was a noninvestigatory inventory or because agents of the government, with lawful possession of the vehicle pending forfeiture, had the right to search it at will.

[Ibid.]
As the Johnson court explained, the position that Cooper went no further than to approve "a noninvestigatory inventory search aimed at protecting police during the period in which a seized vehicle must be held," is supported by the language in Cooper, quoted above, stating that it would be unreasonable to deny police the right to search the vehicle "`even for their own protection,'" as well as by the Court's own characterization of Cooper in later cases. Id. at 231. Thus, in Cady v. Dombrowski, 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706, 718 (1973), in the course of approving a warrantless search of a car removed from a highway accident scene and taken to a private garage, the Court described Cooper as a case where the search was justified "to guarantee the safety of the custodians." In Cady, the search was permitted out of "concern for the safety of the general public who might be endangered if an intruder removed a revolver," which, it was reasonably believed, might be in the trunk of the vehicle of defendant, a Chicago police officer. Ibid.
In South Dakota v. Opperman, 428 U.S. 364, 373, 96 S.Ct. 3092, 3098, 49 L.Ed.2d 1000, 1007 (1976), the Court described Cooper as involving "the inventory of a car impounded under the authority of a state forfeiture statute." In so doing, the Court noted that at the time of the search in Cooper there was no certainty that forfeiture proceedings would even take place and there was, therefore, no reason "to limit Cooper to an impoundment pursuant to a forfeiture statute." Id. at 373 n. 8, 96 S.Ct. at 3099 n. 8, 49 L.Ed.2d at 1008 n. 8. Thus, "the Supreme Court's post-Cooper decisions do support [the] characterization of Cooper's holding as limited to inventory searches." Johnson, supra, 572 F.2d at 232. Indeed, Johnson concluded that language in Opperman to the effect that the standard police procedure followed in that case did not appear to be "`a pretext concealing an investigatory police motive'" might be read to imply "that *798 post-seizure investigatory searches can be made only pursuant to a warrant which lists the items sought and the places to be searched." Id. at 232 & n. 11 (referring to Opperman, supra, 428 U.S. at 376, 96 S.Ct. at 3100, 49 L.Ed.2d at 1009).
Nevertheless, most of the federal circuits have adopted a considerably more expansive view of Cooper,[7] interpreting it to mean that "once a vehicle is validly seized for forfeiture, a subsequent search of it is lawful," id. at 232, based upon "extraneous language in Cooper which seems to have approved the search because it is `closely related to the reason petitioner was arrested, the reason his car had been impounded, and the reason it was being retained.'" Id. at 233 (quoting Cooper, supra, 386 U.S. at 61, 87 S.Ct. at 791, 17 L.Ed.2d at 733). "This interpretation of Cooper rests on the premise that government agents, having obtained possession by a lawful seizure under forfeiture statutes, may search a vehicle at will." Ibid.
Indeed, Johnson itself adopted the expansive view of Cooper although recognizing the "shortcomings" of the rule. Johnson, supra, 572 F.2d at 234. "In effect, it allows a vehicle search to proceed once a valid seizure, with or without a warrant, has been accomplished" even though the "standard of probable cause to support a seizure for forfeiture is less precise and rigorous than that required to obtain a search warrant in ordinary circumstances." Ibid. For example, "a vehicle may be seized even in the absence of probable cause to believe it contains contraband if there is nonetheless probable cause to believe that it was used `to facilitate the transfer of contraband.'" Ibid. (quoting United States v. LaVecchia, 513 F.2d 1210, 1216 (2d. Cir.1975)). Although there is at least one prior Ninth Circuit case that has characterized Cooper as an inventory search, see United States v. Jamerson, 549 F.2d 1263 (9th Cir.1977), other cases in that circuit have adopted the broader view. See Johnson, supra, 572 F.2d at 232-33. Johnson ultimately chose to follow the majority position "because the law on this point is unclear," while in the same breath acknowledging the substantial argument "that the rule goes too far." Id. at 234.
However, the federal decisions are not unanimous, with some clearly viewing Cooper as an inventory case, see United States v. Bush, 647 F.2d 357, 370 (3rd.Cir.1981) and United States v. Pappas, 613 F.2d 324, 330-31 (1st Cir.1979), or employing language that points to a similar interpretation. See O'Reilly v. United States, 486 F.2d 208, 210-11 (8th Cir.1973).[8]
State courts have divided over the proper interpretation of Cooper. A number of cases, while purporting to adopt the broader view of Cooper, have characterized the search of a vehicle seized in contemplation of forfeiture as an inventory search. See *799 State v. Brickhouse, 20 Kan.App.2d 495, 890 P.2d 353, 360-63 (1995) (interpreting Cooper to permit "valid inventory search" of vehicle seized under state forfeiture law); State v. Hall, 52 N.C.App. 492, 279 S.E.2d 111, 114-117 (1981); Capps v. State, 505 S.W.2d 727, 729-30 (Tenn.1974) (during course of "lawful routine inventory" of items in vehicle's trunk, police properly seized stolen checkwriter in "plain view"). Indeed, the notion that Cooper created a new exception to the warrant requirement was specifically rejected in Brickhouse, supra, 890 P.2d at 361. Likewise, in Hall, supra, 279 S.E.2d at 116, the court noted that "Cooper does not, however, stand for the proposition that law enforcement officials have a `blank check' under the Fourth Amendment to conduct warrantless searches of cars lawfully impounded under forfeiture statutes for drug violations, without any limitation as to their scope and purpose." In that case, the court, while sanctioning an inventory search of a seized vehicle, found the search "unreasonable in its scope" with respect to the officers' intrusion into a closed, opaque container. Id. at 115-16. Finally, in State v. Hendrickson, 129 Wash.2d 61, 917 P.2d 563, 570 (1996), the court rejected the expansive interpretation of Cooper in favor of a more restrictive approach under the search and seizure provision of the Washington state constitution.
More importantly, it appears that our Court has also viewed Cooper as an inventory case. See Mangold, supra, 82 N.J. at 584, 414 A.2d 1312. Citing Cooper, the Court said that "[m]ere lawful custody of an impounded vehicle does not ipso facto dispense with the constitutional requirement of reasonableness mandated in all warrantless search and seizure cases." Ibid. The Court's view of Cooper as an inventory search is confirmed by its immediate following citation to Mozzetti v. Superior Court, 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84 (1971) and Wagner v. Commonwealth, 581 S.W.2d 352 (Ky.1979), both of which were inventory search cases. Even more recently, in State v. Cooke, 163 N.J. 657, 665, 751 A.2d 92 (2000), the Court cited Cooper as one of the Supreme Court cases which sanctioned automobile searches based upon "the inherent mobility of automobiles, which created exigent or emergent circumstances making it impracticable to obtain a warrant."
As a result, we read Cooper as sanctioning no more than a routine inventory search. Because there has never been a definitive statement by the Supreme Court clarifying Cooper's recognized ambiguity in the thirty-plus years since that case was decided, we are free to adopt our own view of its holding, unconstrained by opinions of federal courts of appeal. See State v. Coleman, 46 N.J. 16, 36-37, 214 A.2d 393 (1965), cert. denied, 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966). Of course, our freedom to choose a different path does not mean we are free to disregard the reasoning of our federal brethren, if persuasive. However, having considered their views, we are not convinced. Rather, we agree with Hall that the Supreme Court "merely sustained the particular search in Cooper as a reasonable inventory, under the circumstances, even though it was `conducted in a distinctly criminal setting.'" Hall, supra, 279 S.E.2d at 116 (quoting Opperman, supra, 428 U.S. at 373, 96 S.Ct. at 3099, 49 L.Ed.2d at 1007-08). As the court said in Brickhouse, with respect to the argument that enactment of forfeiture statutes creates an exception to the Fourth Amendment's warrant requirement, "[t]o state the position is to refute it, because [the legislature] cannot authorize by legislation what the constitution forbids." Brickhouse, supra, 890 P.2d at 361. Given the deliberative manner by which the Supreme Court has over the years sanctioned *800 a limited number of carefully crafted exceptions to the warrant requirement, we find it unthinkable that the Court buried a new exception within the ambiguous language in Cooper, leaving its contours to be unearthed by lower courts.
We also conclude that even if the Fourth Amendment permitted a warrantless investigative search of a seized vehicle, the citizens of New Jersey have a right to greater protection under our state constitutional protection against unlawful searches and seizures. N.J. Const. art. 1, ¶ 7. Indeed, that greater degree of protection has just recently been confirmed in the context of automobile searches, see Cooke, supra, 163 N.J. at 666-67, 670, 751 A.2d 92, and we have no doubt that similar reasoning would apply to the case now before us.
Thus, we reject the motion judge's conclusion that the "broad interpretation" of Cooper should apply in this case. Rather, and again in disagreement with the motion judge, we assess the validity of the search of the vehicle's trunk and contents under the rules governing inventory searches established by Mangold.[9] As the Court noted, "two levels of inquiry are relevant to determine the propriety of inventory searches." Mangold, supra, 82 N.J. at 583, 414 A.2d 1312. The first determination is whether "the impoundment itself is justified." Ibid. That inquiry need not detain us in this case. Because Ortiz did not raise before the trial court, nor argue on appeal, that the initial seizure of the vehicle was unjustified, we will not address that issue. Miller v. Reis, 189 N.J.Super. 437, 441, 460 A.2d 210 (App.Div.1983).
The second level of inquiry concerns "the legality of the inventory." Mangold, supra, 82 N.J. at 583, 414 A.2d 1312. "Mere lawful custody of an impounded vehicle does not ipso facto dispense with the constitutional requirement of reasonableness mandated in all warrantless search and seizure cases." Id. at 584, 414 A.2d 1312 (citing in part Cooper, supra ). The reasonableness of an inventory search, the Court went on to hold, is to be evaluated against the "reasonableness standards" set forth in Opperman, supra, 428 U.S. at 375-76, 96 S.Ct. at 3100-01, 49 L.Ed.2d at 1009, "such as the scope of the search, the procedure used, and the availability of less intrusive alternatives[.]" Mangold, supra, 82 N.J. at 584, 414 A.2d 1312.
The first issue is whether the inventory was conducted "in accordance with standard departmental procedure." Id. at 585, 414 A.2d 1312. Here, it appears that Detective Cholewa did undertake to conduct an inventory search of the vehicle after it was removed from the State Police barracks to the County Prosecutor's impound yard. Indeed, Cholewa undertook to complete a standard form, entitled Monmouth County Uniform Seizure Report, which contains a block for "inventory of vehicle," which he completed. Thus, as was the case in Mangold, "on this level, it does not appear that the inventory was a subterfuge for a warrantless investigatory search." Id. at 585, 414 A.2d 1312.[10]
*801 However, just as in Mangold, "we find the inventory in this case to be fatally flawed by the failure of the police to discuss the disposition of the [vehicle's] contents with the owner." Id. at 585-86, 414 A.2d 1312. Where it is feasible to do so, the owner of the vehicle "must be given the option of either consenting to the inventory or making his own arrangements for the safekeeping of the property contained in the vehicle. Absent consent or alternative security provisions, an inventory may not be undertaken." Id. at 587, 414 A.2d 1312.[11] In this case, the vehicle was initially seized and Ortiz arrested on July 9, 1998. It appears that Ortiz was released from custody shortly after his arrest. The inventory was not conducted until July 13, 1998. Yet, as Cholewa readily conceded, he made no effort to contact Ortiz with respect to the removal of personal property before conducting his inventory.
As we have noted, the Court in Mangold essentially tracked the requirements of Opperman, supra. However, in the subsequent case of Colorado v. Bertine, 479 U.S. 367, 373-75, 107 S.Ct. 738, 742-43, 93 L.Ed.2d 739 (1987), 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739, 747-48, the Court retreated from the notion that permitting the owner of an impounded vehicle to make alternative arrangements for safekeeping of personal property was required by the Fourth Amendment. Thus, to the extent Mangold rested upon Fourth Amendment jurisprudence it may no longer be valid insofar as the "alternative arrangements" aspect of its holding is concerned. However, as we noted in State v. Mahoney, 226 N.J.Super. 617, 625 n. 3, 545 A.2d 235 (App.Div.1988), Mangold also rested upon our state constitutional guarantee against unlawful searches and therefore remains good law.[12]
The Monmouth County Prosecutor's office had in place a standing order governing "policies and procedures for the safekeeping of motor vehicles seized by the County Prosecutor's Office or by other law enforcement agencies with prior approval of the Prosecutor's Office." The order, effective March 1, 1994, stated as its purpose the safeguarding of "all motor vehicles seized and stored within the compound." Significantly, the order went on to provide as follows:
The owners and/or the user of the motor vehicle must be afforded the opportunity to remove his possessions from the vehicle before the inventory of the vehicle, in the absence of a search warrant or indicia of criminality. Should the owner or user refuse this opportunity, an inventory can then be undertaken. If the owner or user cannot be located after a reasonable attempt, the vehicle can be inventoried.
Nevertheless, it was Cholewa's position that the standard order did not apply to him because the State Police was the seizing *802 agency. We find that position untenable. By its terms, the order was applicable to seized vehicles that were to be stored at the Prosecutor's impound yard, regardless of who seized them. To accept Cholewa's excuse would be to sanction a total avoidance of the Mangold requirement, which was expressed aptly in the general order. Before inventorying the vehicle, someone had to insure that the owner had been advised of the right to removal of personal possessions. If Cholewa believed that the State Police had done so, he should have made inquiry to satisfy himself of that fact. If not, it was his obligation as the inventory officer to do so himself.
The trunk of the vehicle contained numerous personal items, mostly in the form of athletic clothing, including the sneakers, one of which contained the seized currency.[13] Indeed, we note that Cholewa did not separately itemize the contents of the trunk as he should have. While an inventory of a seized vehicle properly includes the contents of a locked trunk, Idaho Department of Law Enforcement v. $34,000 U.S. Currency, 121 Idaho 211, 824 P.2d 142, 146 (1991) (citing W. LaFave, Search and Seizure, § 7.4(a), at 112 (2d ed.1987)), such an inventory must be preceded by an attempt to allow the owner to first remove his own belongings as the entire purpose of the inventory search exception is based upon the need to safeguard the owner's property while it is in police custody.
The possibility that an automobile may be subject to forfeiture does not create a "right to forfeit the contents, which must be returned to the owner thereof." McFadden, supra, 820 P.2d at 57. Given the importance of the warrant requirement, any exception, including the right to inventory impounded vehicles, cannot be permitted to "swallow up the general rule.... To prevent inventories from becoming a convenient method to bypass the preference of the Fourth Amendment for a warrant and thereby permit officers to search freely for evidence in impounded vehicles, the reasonableness of each inventory search must be strictly construed." Hall, supra, 279 S.E.2d at 117.
As the Court stated in Slockbower, supra, 79 N.J. at 12, 397 A.2d 1050:
The point to be made is that constitutional rights to privacy in vehicles and effects must be accorded respect by police as well as courts and cannot be subordinated to mere considerations of convenience to the police short of substantial necessities grounded in the public safety. The burden of establishing such necessity in any given case of claimed right to impound and inventory a car rests on the police.
Despite the commendable effort of the Monmouth County Prosecutor's Office to comply with Mangold through its standing order, we find that the search in this case was not conducted in accordance with the constitution.[14] As a result, the search which led to seizure of the $3910 was unlawful and that money was not subject to forfeiture.

*803 II.
We now turn to the forfeiture of the vehicle itself and the $700 found on the front floor.
The forfeiture statute provides, in pertinent part:
a. Any interest in the following shall be subject to forfeiture and no property right shall exist in them:
(1) Controlled dangerous substances, firearms which are unlawfully possessed, carried, acquired or used, illegally possessed gambling devices, untaxed cigarettes and untaxed special fuel. These shall be designated prima facie contraband.
(2) All property which has been, or is intended to be, utilized in furtherance of an unlawful activity, including, but not limited to, conveyances intended to facilitate the perpetration of illegal acts, or buildings or premises maintained for the purpose of committing offenses against the State.
(3) Property which has become or is intended to become an integral part of illegal activity, including, but not limited to, money which is earmarked for use as financing for an illegal gambling enterprise.
(4) Proceeds of illegal activities, including, but not limited to, property or money obtained as a result of the sale of prima facie contraband as defined by subsection a.(1), proceeds of illegal gambling, prostitution, bribery and extortion.

[N.J.S.A. 2C:64-1a.]
Whereas the items designated in -1a(1) are deemed "prima facie contraband," those categories covered by sections -1a(2) to -1a(4) are known as "derivative contraband," that is, property which "is itself innocent in nature but has been used or is intended to be used in furtherance of an unlawful activity or is the proceeds of illegal activities." State v. Seven Thousand Dollars, 136 N.J. 223, 233, 642 A.2d 967 (1994). Thus, the automobile and the currency at issue in this case are "derivative contraband." The "unlawful activity" specified in the statute must be an indictable crime, ibid. (citing State v. One (1) 1979 Chevrolet Camaro Z-28, 202 N.J.Super. 222, 229-30, 494 A.2d 816 (App.Div.1985)), although it is not required that anyone be convicted of that crime. Ibid. (citing N.J.S.A. 2C:64-4). Indeed, "the statute also does not require that anyone actually be charged with the indictable activity." Id. at 234, 642 A.2d 967. Finally, "the unlawful activity can be a past crime or an intended but not-yet-completed offense." Ibid.
The statute "require[s] a direct causal connection between the use of the property and the crime." Ibid. (citing State v. One 1986 Subaru, 120 N.J. 310, 320, 576 A.2d 859 (1990)). The connection must be "proximate and substantial," which "connotes a sense of dependency; a merely causal relationship will not suffice." Id. at 234-35, 642 A.2d 967. The finding of "a direct, causal relationship is necessarily a fact-specific determination." Id. at 235, 642 A.2d 967.
Within this analytical framework, the Law Division judge granted summary judgment with respect to forfeiture of the $700 and the vehicle. To summarize, the currency was found inside of a day planner on the front floor of the vehicle; "stacked in multiple twenty dollar folds in groups of fifty dollar stacks." A trace amount of marijuana was found in the side compartment of the right front door and, more importantly, twenty-one ecstasy tablets were found in the center console.
The judge concluded that there was a "direct causal connection between the vehicle *804 and the unlawful possession of the CDS" in that "the vehicle was being used for the purpose of possession, sale, or disposition to a third party." The judge continued as follows:
Because of the presence of the drugs, the large amounts of money, the way in which the $700 and the $3900 was packaged and labeled, the Court finds by a preponderance of the evidence that the seized items all were part of a criminal activity. Packaging of a seized currency may be considered in evaluating probable cause.
Finally, the trial judge again referred to "the method of packaging of the $3900 and the $700 in the vehicle," as well as to the lack of credibility in Ortiz's explanations concerning the origin of the money found in the trunk.
The judge's conclusions with respect to the packaging of the currency were apparently drawn from Detective Licitra's expert opinion, which was expressed in a report of March 9, 1999, as well as his testimony at the hearing on September 25, 2000. However, the judge's actual decision to forfeit the vehicle and the $700 came on a motion for summary judgment decided on July 12, 1999, at which time the judge only had Licitra's report in which he concluded:
The amount of ecstasy seized in this case is consistent with the charge of Possession with the Intent to Distribute even though the defendant was not charged with this offence. Based upon the amount of ecstasy seized, the amount of United States currency folded in the manner in which it was and the fact that the drug canine reacted positive to the money it is this officer's opinion that the money seized in this case are proceeds from an illegal narcotics operation.
It is clear that Licitra's opinion was based in substantial part on the $3910, both its amount and packaging, and that the judge's decision was, in turn, influenced by the expert opinion.[15]
Because we have found that the $3910 must be suppressed, we are unable to determine whether Licitra's opinion would remain the same or be modified without that evidence. For the same reason, we cannot determine what the trial judge's decision would be based upon any such revised opinion. Accordingly, we believe the matter of the vehicle and the $700 should be remanded for a new hearing based upon evidence, including any expert opinion, that does not encompass the $3910. We leave it to the trial court in the first instance to determine whether, based upon appropriate proofs, the car and the $700 are subject to forfeiture.
We comment briefly on one aspect of the court's summary judgment ruling. The judge took note of the rebuttable presumption established by N.J.S.A. 2C:64-3j, finding that Ortiz had failed to negate that presumption as to both the car and money. The provision provides:
Evidence of a conviction of a criminal offense in which seized property was either used or provided an integral part of the State's proofs in the prosecution shall be considered in the forfeiture proceedings as creating a rebuttable presumption that the property was utilized in furtherance of an unlawful activity.
Ortiz pleaded guilty to possession of CDS, not possession with intent to distribute. *805 Thus, for the rebuttable presumption to come into play, the vehicle and $700 would either have to have been "used" in connection with that offense or have "provided an integral part of the State's proofs in" such a possession prosecution. On remand, the judge will be required to articulate the connection between the car and/or money and one or the other prong of the presumption. For example, a showing would have to be made that the money was either used in connection with the possession offense or provided an integral part of the State's proofs as to the possession offense, and the same type of finding would have to be made as to the vehicle. In that regard, we note the State's concession before the trial court that it could not logically assert that the money was "connected to the defendant's specific simple possession. The crime that he pled guilty to, the simple possession of the 21 Ecstasy pills."
Further, the statute requires that property be forfeited if it "has been, or is intended to be, utilized in furtherance of an unlawful activity...." N.J.S.A. 2C:64-1a(2). The State agreed that it had specified N.J.S.A. 2C:21-25 in answer to interrogatories as the unlawful activity involved and agreed with the court that it was limited to that statute as a result of its answers. That statute criminalizes the transportation or possession of "property known to be derived from criminal activity," N.J.S.A. 2C:21-25a, which means that the person "knows that the property involved represents some form, though not necessarily which form, of criminal activity." N.J.S.A. 2C:21-25d. While we are at a loss to understand why the State limited itself to "money laundering" as the specified unlawful activity, the State never amended its answers to interrogatories and the trial judge never addressed this statute as the unlawful activity involved. Indeed, it appears that the court viewed the unlawful activity as distribution of CDS. On remand, the nature of any unlawful activity must be clarified and a connection demonstrated between the property subject to forfeiture and that specific activity, which need not have been charged. Seven Thousand Dollars, supra, 136 N.J. at 234, 642 A.2d 967.
We reverse as to the $3910 and order that currency be returned to Ortiz; we remand for further proceedings as to the vehicle and $700.
NOTES
[1] The amount in question is sometimes referred to by the trial judge as $3900 but, in fact, the amount seized was $3910.
[2] In fact, Ortiz had been sentenced for possession of marijuana (over fifty grams) and the unlawful possession of a weapon on April 4, 1997.
[3] According to the record, Ecstasy is a controlled dangerous substance, also known as MDMA, or, methylene dioxide methamphetamine, and it sells for approximately $20 to $30 per pill.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] Although the court's opinion of December 21, 2000 deals extensively with the search issue, defendant's motion to suppress was actually denied on the record at the time of the July 12, 1999 summary judgment hearing, a ruling later embodied in an order of October 1, 1999, well before the September 2000 hearing.
[6] The dissenting justices were of the view that the case was governed by Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). Cooper, supra, 386 U.S. at 62-65, 87 S.Ct. at 791-93, 17 L.Ed.2d at 734-36 (Douglas, J., dissenting). The majority found Preston distinguishable as involving a car searched after it was removed from the street to the police station after Preston had been arrested for vagrancy. The majority concluded that the impoundment and subsequent search of the vehicle in Preston was unrelated to Preston's arrest, unlike the situation in Cooper. Id. at 61, 87 S.Ct. at 791, 17 L.Ed.2d at 733. The dissenters found Cooper "on all fours" with Preston. Id. at 65, 87 S.Ct. at 793, 17 L.Ed.2d at 735 (Douglas, J., dissenting).
[7] See, e.g., United States v. Modica, 663 F.2d 1173, 1177 (2nd Cir.1981), cert. denied, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); United States v. $29,000 U.S. Currency, 745 F.2d 853, 856 (4th Cir.1984); United States v. Pruett, 551 F.2d 1365, 1369-70 (5th Cir.1977); United States v. White, 488 F.2d 563, 564-65 (6th Cir.1973); United States v. Alvarez, 833 F.2d 724, 728 (7th Cir.1987); United States v. Young, 456 F.2d 872, 874 (8th Cir.1972); United States v. Kimak, 624 F.2d 903, 905-06 (9th Cir.1980); United States v. Merryman, 630 F.2d 780, 785 (10th Cir.1980).
[8] Thus, O'Reilly states, citing Cooper, that "[o]nce the car was legally seized, pursuant to the federal forfeiture statute, the arresting officers were entitled to inventory the contents of the car and take possession of the items found therein." O'Reilly, supra, 486 F.2d at 210 (emphasis added). However, the court then continues to justify the search by reference to its earlier decision in United States v. Young, 456 F.2d 872 (8th Cir.1972), a case which clearly adopted the broad reading of Cooper. O'Reilly, supra, 486 F.2d at 211.
[9] As Judge Conford noted in State v. Slockbower, 79 N.J. 1, 15, 397 A.2d 1050 (1979), while often viewed as a "separate exception to the warrant requirement," the inventory search may be more properly seen as "a sub-species of the exception denominated `exigent circumstances.'"
[10] The fact that police may simultaneously harbor a subjective belief or hope that incriminating evidence may be found does not necessarily serve to invalidate an otherwise proper inventory search. 3 W. LaFave, Search and Seizure § 7.5(d) (3d ed.1996).
[11] State courts appear to be split on this requirement. See LaFave, supra, § 7.3(c) at 525-28 nn. 69-80.
[12] Although Mangold does not directly cite our state constitutional guarantee as a premise of its holding, the Court did note that its determination is the natural corollary to our decisions in Slockbower [State v. Slockbower, 79 N.J. 1, 397 A.2d 1050 (1979)] and Ercolano [State v. Ercolano, 79 N.J. 25, 397 A.2d 1062 (1979)]. Mangold, supra, 82 N.J. at 587, 414 A.2d 1312. Both Slockbower, supra, 79 N.J. at 13, 397 A.2d 1050 and Ercolano, supra, 79 N.J. at 30, 397 A.2d 1062, did rely upon the state constitution. As a result, the statement in Mahoney, supra, 226 N.J.Super. at 625 n. 3, 545 A.2d 235, that "our Supreme Court in State v. Mangold has construed Art. 1, par. 7 of the New Jersey Constitution more broadly [than the Fourth Amendment] so as to confer greater protection to the individual," appears entirely accurate.
[13] We have reviewed photos of the trunk and its contents taken pursuant to the general order.
[14] Because we find the entire search of the trunk unlawful, we need not explore whether the money was found as a result of what might be termed a search of a closed container, and impermissible for that reason. See United States v. Judge, 864 F.2d 1144 (5th Cir.1989), cert. denied, 495 U.S. 918, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990); Hall, supra, 279 S.E.2d at 115-16. At oral argument, the State conceded that the discovery of the cash came about as a result of a search.
[15] At the hearing, Licitra confirmed that his March 9, 1999 report was based "on the totality of the case." He confirmed that the three main factors in his opinion were the drugs themselves, the way in which the currency was folded into denominations and the "larger seizure of the money that was hidden inside the trunk."