# IN THE SUPREME COURT OF IOWA

No. 16–0736

Filed June 29, 2018

**STATE OF IOWA,**

Appellee,

vs.

**BION BLAKE INGRAM,**

Appellant.

Appeal from the Iowa District Court for Jasper County, Steven J. Holwerda, Judge.

Defendant appeals his conviction for possession of methamphetamine. **REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.

**APPEL, Justice.**

In this case, a driver challenges the constitutionality of an inventory search of his vehicle, which was to be towed after police discovered it was not lawfully registered. After conducting a search, the police found a controlled substance. The district court denied the driver's motion to suppress, and he was convicted of possession. The driver argues this search was unconstitutional under the Fourth Amendment of the United States Constitution. Alternatively, even if the Federal Constitution does not prohibit warrantless inventory searches under these particular circumstances, the driver argues article I, section 8 of the Iowa Constitution provides greater protections.

We accept the invitation to restore the balance between citizens and law enforcement by adopting a tighter legal framework for warrantless inventory searches and seizures of automobiles under article I, section 8 of the Iowa Constitution than provided under the recent precedents of the United States Supreme Court. In doing so, we encourage stability and finality in law by decoupling Iowa law from the winding and often surprising decisions of the United States Supreme Court. In the words of another state supreme court, we do not allow the words of our Iowa Constitution to be "balloons to be blown up or deflated every time, and precisely in accord with the interpretation of the U.S. Supreme Court, following some tortious trail." *Penick v. State*, 440 So. 2d 547, 552 (Miss. 1983). We take the opportunity to stake out higher constitutional ground today.

## I. Facts and Procedural Background.

At about 6:39 a.m. on October 30, 2015, a police officer pulled over Bion Ingram, who was driving on Highway 14 in Newton, Iowa. The officer had noticed the vehicle's license plate was not illuminated as required. After speaking with Ingram, the officer also noticed the

vehicle's registration sticker did not match its license plate—the vehicle's actual registration had expired in 2013. Because of the registration violation, the officer decided to impound the vehicle and told Ingram it would be towed.

The officer did not arrest Ingram at that point but had him sit in the patrol vehicle while the officer wrote citations for the traffic violations. Ingram told the officer he was going to work, and the officer agreed to drive Ingram to a nearby gas station for Ingram's friend to pick him up and take him to work. Ingram asked to be able to retrieve his work items from the vehicle, but the officer did not allow Ingram to do this until the officer finished writing the citations.

The officer told Ingram the contents of the vehicle would be inventoried before towing and asked Ingram if there was anything of value in the vehicle. Ingram said there was nothing of value in the vehicle. Another officer arrived and inventoried the contents of the vehicle. The officers did not obtain a warrant to search the vehicle.

During the inventory, the second officer discovered a black cloth bag on the floor next to the gas pedal. When the officer opened the bag, the officer discovered a glass pipe and what field tests revealed to be almost a gram of methamphetamine. Ingram was arrested.

Ingram was charged by trial information with possession of methamphetamine, second offense, and charged by citation with possession of drug paraphernalia. Ingram filed a motion to suppress the results of the search based on the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. Ingram argued the search violated his rights under the Fourth Amendment and article I, section 8. Ingram contended the inventory search should not have been conducted and the vehicle impoundment

was a pretext to search the vehicle. The State resisted. The district court held a hearing on the motion to suppress and denied the motion on the ground that inventory searches are an exception to the warrant requirement.

Ingram was tried on the minutes on March 30, 2016. The judge found Ingram guilty of both charges on April 4. Ingram appealed and we retained the appeal.

On appeal, Ingram argues the district court erred by (1) denying his motion to suppress because the inventory searched violated the United States and Iowa Constitutions and (2) finding there was sufficient evidence that he knowingly possessed a controlled substance. Ingram also argues he received ineffective assistance of counsel when his trial counsel failed to challenge the admissibility of the results of the field drug test. Because we hold that Ingram's motion to suppress should have been granted, we do not reach the other issues.

## II. Standard of Review.

We review the denial of a motion to suppress on constitutional grounds de novo. *State v. Wilkes*, 756 N.W.2d 838, 841 (Iowa 2008); *State v. Heuser*, 661 N.W.2d 157, 161 (Iowa 2003).

## III. Iowa vs. United States Constitution.

This case involves a challenge to a warrantless inventory search and seizure of an automobile under the search and seizure provisions of the Iowa and United States Constitutions. At the outset, it is important to emphasize that this court is the ultimate arbiter of the meaning of the search and seizure clause of article I, section 8 of the Iowa Constitution, while the United States Supreme Court has the final say in interpreting the search and seizure provision of the Fourth Amendment to the United States Constitution.

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. Article I, section 8 of the Iowa Constitution requires that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated." Iowa Const. art. I, § 8.

Although the Iowa and United States Constitutions have similarly worded search and seizure provisions, that does not mean the two regimes and the cases under them may be conflated. We jealously reserve the right under our state constitutional provisions to reach results different from current United States Supreme Court precedent under parallel provisions. *See, e.g.*, *Zaber v. City of Dubuque*, 789 N.W.2d 634, 654 (Iowa 2010); *Wilkes*, 756 N.W.2d at 842 n.1; *Kingsway Cathedral v. Iowa Dep't of Transp.*, 711 N.W.2d 6, 9 (Iowa 2006). As has been noted by other state courts before us, it would amount to malpractice for lawyers not to understand the potential for an independent state court interpretation under the state constitution that is more protective of individual rights. *State v. Lowry*, 667 P.2d 996, 1013 (Or. 1983) (en banc) (Jones, J., concurring specially); *Commonwealth v. Kilgore*, 719 A.2d 754, 757 (Pa. Super. Ct. 1998); *State v. Jewett*, 500 A.2d 233, 234 (Vt. 1985); *see also State v. Baldon*, 829 N.W.2d 785, 816 (Iowa 2013) (Appel, J., concurring specially). The caselaw and law commentaries now groan with the volume and weight of ample materials for lawyers to construct independent state constitutional law varying from applicable federal precedent. *See State v. Short*, 851 N.W.2d 474, 489–91 (Iowa 2014); *State v. Ochoa*, 792 N.W.2d 260, 264–65 & nn.2–3 (Iowa 2010).

The growth of independent state constitutional law is important in the search and seizure context. Unlike the decisions of the United States Supreme Court in recent years, which generally have sought to minimize the scope of individual protection under the Fourth Amendment, our recent caselaw under the search and seizure provision of the Iowa Constitution has emphasized the robust character of its protections. *See, e.g., State v. Coleman*, 890 N.W.2d 284, 299 (Iowa 2017); *State v. Gaskins*, 866 N.W.2d 1, 6–7 (Iowa 2015); *Short*, 851 N.W.2d at 482–85; *Baldon*, 829 N.W.2d at 833–34; *Ochoa*, 792 N.W.2d at 274. We have repeatedly declined to follow the approach of the United States Supreme Court in its interpretation of what one commentator has referred to as an ever-shrinking Fourth Amendment. *See Gaskins*, 866 N.W.2d at 12–13; *Short*, 851 N.W.2d at 506; *Baldon*, 829 N.W.2d at 803 (majority opinion); *Ochoa*, 792 N.W.2d at 291; *see generally* Silas J. Wasserstrom, *The Incredible Shrinking Fourth Amendment*, 21 Am. Crim. L. Rev. 257 (1984).

In this case, Ingram raises his challenge under the search and seizure provisions of both the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. Ingram's argument under the United States Constitution cites to federal cases that generally provide warrantless inventory searches of automobiles are permissible, if they are conducted pursuant to policies adopted by law enforcement which govern the decision to impound the vehicle and the nature and scope of any subsequent search. *See Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632, 1635 (1990); *United States v. Kennedy*, 427 F.3d 1136, 1144 (8th Cir. 2005).

The challenge raised by Ingram under the search and seizure provision of article I, section 8 of the Iowa Constitution has different dimensions. Ingram notes a number of state courts have rejected the

two-pronged policy approach of the United States Supreme Court in favor of a more restrictive approach that sharply limits warrantless searches and seizures of automobiles. *See, e.g.*, *State v. Daniel*, 589 P.2d 408, 417–18 (Alaska 1979); *State v. Lucas*, 859 N.E.2d 1244, 1251 (Ind. Ct. App. 2007); *State v. Mangold*, 414 A.2d 1312, 1318 (N.J. 1980); *State v. Hite*, 338 P.3d 803, 809 (Or. Ct. App. 2014).

When a party raises claims under both the Federal and State Constitutions, this court has generally held we retain the discretion whether to proceed to analyze the case in the first instance under the State or Federal Constitution. *State v. Pals*, 805 N.W.2d 767, 772 (Iowa 2011). In contrast, some states adopt a primary-state-law approach to dual constitutional claims, where the court will almost or mostly always consider state constitutional claims before moving on to consider federal constitutional claims. *See State v. Kono*, 152 A.3d 1, 27 (Conn. 2016) (explaining when federal law is unclear or defendant not entitled to relief thereunder, court will consider state constitutional claim first); *Malyon v. Pierce County*, 935 P.2d 1272, 1277 (Wash. 1997) (en banc) (stating when the issue is adequately briefed, court will analyze the state constitutional issue first); *see generally* Eric M. Hartmann, Note, *Preservation, Primacy, and Process: A More Consistent Approach to State Constitutional Law*, 102 Iowa L. Rev. 2265, 2282 (2017).

Although the primary approach has attractive features, it also has problems. Notwithstanding the caselaw developing independent state constitutional law, trial court records often reveal counsel had not raised an independent state constitutional argument at all. When this occurs, appellate counsel must advance an ineffective-assistance-of-counsel claim to preserve the issue. When a double-barreled preservation problem occurs, namely, where the state constitutional issue is not

raised in the district court and the failure to do so is not presented as an ineffective-assistance-of-counsel claim on appeal, we decline to reach the state constitutional issues. *See State v. Prusha*, 874 N.W.2d 627, 629–30 (Iowa 2016).

Minimally better, counsel sometimes have merely added a citation to article I, section 8 of the Iowa Constitution but then generally adopted federal caselaw in describing the claim. Where state constitutional law claims have been minimally preserved in this fashion, we may, in our discretion, decide the case based on potentially dispositive federal constitutional grounds and save our state constitutional interpretation for another day. In the alternative, we may apply the federal standards in a fashion more stringent than under federal caselaw. *See Pals*, 805 N.W.2d at 772. Given the inconsistent presentation of state constitutional claims in our cases, we have so far declined to adopt a primary approach that requires us to consider and resolve state constitutional claims prior to addressing federal constitutional claims. *Baldon*, 829 N.W.2d at 821–22 (Appel, J., concurring specially).

In this case, however, Ingram raised the Iowa constitutional issue in the district court. In his appellate briefing, Ingram has specifically urged us to follow a different approach to warrantless inventory searches under the Iowa Constitution than has been employed by recent cases of the United States Supreme Court and, to the extent the claim was not preserved in the district court, has raised an ineffective-assistance claim. We will proceed to consider the state constitutional issues.

**IV. Warrantless Inventory Searches and Seizures of Automobiles Under Article I, Section 8 of the Iowa Constitution.**

**A. Overview of Constitutional Choices.**

1. *Introduction.* Constitutional interpretation of open-textured provisions of a state constitution is always about choice. *See* Todd E. Pettys, *Judicial Discretion in Constitutional Cases,* 26 J.L. & Pol. 123, 124 (2011). Judicial development of open-textured constitutional provisions is not a mathematical exercise, inexorably leading to a provable answer. *See Gompers v. United States*, 233 U.S. 604, 610, 34 S. Ct. 693, 695 (1914) ("But the provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic, living institutions transplanted from English soil."), *disapproved of on other grounds by Bloom v. Illinois*, 391 U.S. 194, 211, 88 S. Ct. 1477, 1487 (1968). As judges, in interpreting open-textured provisions of the Iowa Constitution, it is our duty to select from possible plausible alternative approaches the best approach to reflect the important constitutional values underlying the text. State constitutional law is not about proofs, but about informed choices.

In order to consider the proper framework for analyzing the validity of warrantless inventory searches and seizures involving automobiles under article I, section 8 of the Iowa Constitution, it is helpful to lay out the various constitutional choices made by the United States Supreme Court and the courts of other states under state constitutional search and seizure provisions. The constitutional choices made by the United States Supreme Court and other state courts are, of course, not binding upon us, but they may broaden our constitutional perspectives, may provide us with helpful insights, and may help guide the ultimate resolution of the Iowa constitutional issue before us. With respect to the cases of the United States Supreme Court, we must be attentive to Justice Harlan's often-quoted observation that because of federalism concerns, the Supreme Court may underenforce constitutional norms in

its interpretation of federal constitutional provisions when they are applied against the states, *Ker v. California*, 374 U.S. 23, 44, 83 S. Ct. 1623, 1645–46 (1963) (Harlan, J., concurring), and to the equally often-quoted and somewhat sheepish observation by the Supreme Court that states are free to adopt approaches more protective of liberty under their state constitutions, *Bustop, Inc. v. Board of Education of Los Angeles*, 439 U.S. 1380, 1382, 99 S. Ct. 40, 41 (1978). In short, we look to the decisions of other courts, including the decisions of the United States Supreme Court, not because they are authoritative, but in the hope their logic and rationales may be persuasive. *Ochoa*, 792 N.W.2d at 267; *Kingsway Cathedral*, 711 N.W.2d at 9.

2. *Approach to warrantless inventory searches and seizures involving automobiles prior to recent United States Supreme Court cases.* We begin with a brief review of state and federal cases prior to recent United States Supreme Court cases related to warrantless inventory searches and seizures of automobiles. As will be seen below, the cases are rich and varied.

For example, a leading early state court case is *Mozzetti v. Superior Court*, 484 P.2d 84 (Cal. 1971) (en banc). The *Mozzetti* court began by discussing the privacy interests involved in searches of automobiles. *Id.* at 88. According to the court,

> It seems undeniable that a routine police inventory of the contents of an automobile involves a substantial invasion into the privacy of the vehicle owner. Regardless of professed benevolent purposes and euphemistic explication, an inventory search involves a thorough exploration by the police into the private property of an individual.

*Id.*

In analyzing the government's interest in a warrantless inventory search of an automobile, the *Mozzetti* court observed, "[I]tems of value

left in an automobile to be stored by the police may be adequately protected merely by rolling up the windows, locking the vehicle doors and returning the keys to the owner." *Id.* at 89. Turning to the issue of protecting the defendant or the police against theft or tort claims, the court noted if the article was either stolen before the inventory or perhaps innocently omitted when the inventory was taken, the inventory documentation would be of little use. *Id.* at 89–90; *see also People v. Nagel*, 95 Cal. Rptr. 129, 133 (Ct. App. 1971) (holding warrantless inventory search of impounded car after red light violation invalid, as there was no apparent reason why driver could not have driven vehicle to nearby place for safekeeping); *Virgil v. Super. Ct.*, 73 Cal. Rptr. 793, 795 (Ct. App. 1968) (holding warrantless inventory search of impounded car invalid since there was no reason why passengers in the car could not have taken charge of the vehicle and driver was not consulted with respect to his automobile); Charles E. Moylan, Jr., *The Inventory Search of an Automobile: A Willing Suspension of Disbelief*, 5 U. Balt. L. Rev. 203, 216–20 (1976) [hereinafter Moylan].

The *Mozzetti* court's skepticism about the efficacy of an inventory search protecting police against false claims was repeated by an Arizona court of appeals in *In re One 1965 Econoline*, 495 P.2d 504, 508 (Ariz. Ct. App. 1972), *rev'd*, 511 P.2d 168 (Ariz. 1973) (en banc). The Arizona appellate court observed,

> We fail to see how the taking of an inventory will insulate the police against false accusations of theft and assure the property owner that his property will not be taken. Unscrupulous persons who desire to steal articles will simply not list them on the inventory. Owners who wish to assert spurious claims against law enforcement officers or the garage owners can simply claim that the officers did not list them on the inventory.

*Id.* at 508–09; *see* Moylan, 5 Balt. L. Rev. at 217–18.

Some early state court cases held law enforcement must explore the possibility of making alternate arrangements for a vehicle with an owner or driver before impoundment occurs. *See, e.g., Miller v. State*, 403 So. 2d 1307, 1314 (Fla. 1981) (analyzing search under Fourth Amendment and search and seizure provisions of Florida Constitution), *overruled by State v. Wells*, 539 So. 2d 464, 469 (Fla. 1989); *Strobhert v. State*, 301 S.E.2d 681, 682 (Ga. 1983) (discussing search and seizure generally, not indicating specific constitutional provisions); *State v. Fortune*, 689 P.2d 1196, 1203 (Kan. 1984) (ruling under Fourth Amendment and search and seizure provisions of Kansas Constitution).

There are also a number of early state court cases holding containers may not be opened pursuant to a warrantless inventory search. For example, the Alaska Supreme Court held a warrantless search of luggage, containers, or packages in an automobile violated the search and seizure provisions of the Alaska Constitution. *Daniel*, 589 P.2d at 417–18. Similarly, the Alaska Supreme Court also held closed containers taken from a person before incarceration may not be further opened or searched except pursuant to a warrant unless there is a recognized exception to the warrant requirement. *Reeves v. State*, 599 P.2d 727, 735–36 (Alaska 1979). A number of other state cases similarly held warrantless inventory searches of closed containers invalid under the Fourth Amendment and/or state constitutional search and seizure provisions. *See State v. Gwinn*, 301 A.2d 291, 296 (Del. 1972) (finding search of satchel during warrantless inventory of automobile not necessary for protection of owner and risk satchel might contain explosives or dangerous substance too conjectural to justify search under Fourth Amendment); *People v. Dennison*, 378 N.E.2d 220, 224 (Ill. App. Ct. 1978) (holding warrantless inventory search may not extend to

toolbox under Fourth Amendment); *State v. Jewell*, 338 So. 2d 633, 639–40 (La. 1976) (holding under Fourth Amendment and search and seizure provisions of Louisiana Constitution, warrantless search of an over-the-counter pill bottle was not conducted pursuant to a legitimate inventory search, but even if it had been, a true inventory search would never involve examining contents of a pill bottle); *State v. Downes*, 591 P.2d 1352, 1354 (Or. 1979) (en banc) (holding exigent circumstances must exist to justify warrantless inventory search of closed container under Fourth Amendment); *State v. Prober*, 297 N.W.2d 1, 12 (Wis. 1980) (search of purse pursuant to warrantless inventory search unlawful under Fourth Amendment and search and seizure provisions of Wisconsin Constitution), *overruled by State v. Weide*, 455 N.W.2d 899, 904 (Wis. 1990) (holding *Colorado v. Bertine*, 479 U.S. 367, 107 S. Ct. 738 (1987), requires rejection of *Prober* in Fourth Amendment analysis and declining to adopt independent standard under Wisconsin Constitution).

There are early warrantless inventory search and seizure cases, however, that provided more leeway to law enforcement. For example, in *Cabbler v. Commonwealth*, the Virginia Supreme Court upheld a warrantless inventory search of an automobile under the Fourth Amendment pursuant to a police department policy to protect the property of an arrested citizen. 184 S.E.2d 781, 783 (Va. 1971). In *Warrix v. State*, the Wisconsin Supreme Court held a warrantless inventory search of a car in police custody was proper under the Fourth Amendment in order to protect police from claims of theft of personal property. 184 N.W.2d 189, 194 (Wis. 1971). The Minnesota Supreme Court held a warrantless inventory search pursuant to a standard procedure was a reasonable measure under the Fourth Amendment to

protect the car and its contents after it was impounded by the police. *City of St. Paul v. Myles*, 218 N.W.2d 697, 699, 701 (Minn. 1974); *see also State v. Tully*, 348 A.2d 603, 609–10 (Conn. 1974) (holding warrantless search of motor vehicle was acceptable under the Fourth Amendment); *People v. Sullivan*, 272 N.E.2d 464, 469 (N.Y. 1971) (holding warrantless search was reasonable within the Fourth Amendment); *State v. Criscola*, 444 P.2d 517, 519–20 (Utah 1968) (upholding warrantless search under the Fourth Amendment). As will be seen below, cases like *Cabbler* foreshadowed the later approach of the United States Supreme Court to warrantless inventory search and seizure involving automobiles.

3. *Approach to warrantless inventory searches and seizures involving automobiles in recent cases of the United States Supreme Court.* In recent years, the United States Supreme Court has narrowly construed the search and seizure protections contained in the Fourth Amendment. In particular, it has placed less emphasis on the warrant requirement and embarked on an ever-increasing expansion of exceptions to the warrant requirement. While the traditional touchstone of Fourth Amendment law under prior Supreme Court cases was the warrant requirement, *see, e.g.*, *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 2032 (1971); *Katz v. United States*, 389 U.S. 347, 356–57, 88 S. Ct. 507, 514 (1967); *Jones v. United States*, 357 U.S. 493, 499, 78 S. Ct. 1253, 1257 (1958), the new innovative touchstone under the more recent Supreme Court cases is a free-floating and open-ended concept of "reasonableness" that is unhinged from the warrant requirement expressly contained in the Fourth Amendment, *see, e.g.*, *Maryland v. King*, 569 U.S. 435, 448, 133 S. Ct. 1958, 1970 (2013);

*Wilson v. Arkansas*, 514 U.S. 927, 931, 115 S. Ct. 1914, 1916 (1995); *O'Connor v. Ortega*, 480 U.S. 709, 728–29, 107 S. Ct. 1492, 1503 (1987).

The field of warrantless inventory search and seizure has been no exception to this general revisionist trend away from the traditional Fourth Amendment warrant requirement. *See* Silas J. Wasserstrom, *The Court's Turn Toward a General Reasonableness Interpretation of the Fourth Amendment*, 27 Am. Crim. L. Rev. 119, 127, 148 (1989). The recent approach of the United States Supreme Court is to allow warrantless inventory searches and seizures of automobiles by law enforcement authorities, provided they are conducted pursuant to generally applicable local policy requirements that are "reasonable." *Bertine*, 479 U.S. at 371–72, 107 S. Ct. at 741.

Under the United States Supreme Court cases, the nature and scope of the warrantless search must be conducted pursuant to a standardized local policy. *See Wells*, 495 U.S. at 4, 110 S. Ct. at 1635; *Bertine*, 479 U.S. at 376, 107 S. Ct. at 743 (Blackmun, J., concurring); *South Dakota v. Opperman*, 428 U.S. 364, 383, 96 S. Ct. 3092, 3104 (1976) (Powell, concurring). If the warrantless impoundment of the vehicle and the warrantless search of the vehicle are authorized by reasonable local policy, the warrantless inventory search passes constitutional muster. *See Wells*, 495 U.S. at 4, 110 S. Ct. at 1635. Under the Supreme Court approach, there is no requirement that local police inventory policies use the least intrusive means to advance the goals of law enforcement. *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S. Ct. 2605, 2610 (1983). A warrantless inventory search and seizure might be invalid if the accused can show the government action was "in bad faith or for the sole purpose of investigation," a very high bar. *Bertine*, 479 U.S. at 372, 107 S. Ct. at 741 (majority opinion).

Because of its emphasis on local policy determined by law enforcement, constitutionally permissive warrantless searches pursuant to an inventory process may vary from jurisdiction to jurisdiction. It allows local law enforcement culture to be brought to bear in expanding or contracting the scope of Fourth Amendment rights through adoption of broad or narrow warrantless inventory search and seizure policies. Thus, under the Fourth Amendment, whether a container may be searched as part of a warrantless inventory process may turn on the policies of the jurisdiction where the search occurred. Plainly, the Supreme Court's approach accommodates, and was no doubt animated by, federalism concerns.

Under the federal approach, local law enforcement, and not independent and impartial judges, may set the contours of the substantive protections for liberty under the Fourth Amendment in the field of warrantless inventory searches through the crafting of local policy. This empowerment of local law enforcement to determine the substance of Fourth Amendment protections in the context of warrantless inventory searches and seizures of automobiles is rich with irony, as the Fourth Amendment was explicitly designed as a bulwark to restrain law enforcement in the context of searches and seizures. Under the United States Supreme Court precedent, local law enforcement is authorized to restrict itself, a process unlikely to provide robust protections to persons drawn into the warrantless inventory search and seizure net and more likely to reflect law enforcement convenience.

The United States Supreme Court also has not required a warrantless inventory search and seizure policy be in writing, but instead the policy may be established by custom and practice. *See Bertine*, 479 U.S. at 373 n.5, 107 S. Ct. at 742 n.5 (discussing testimony of other

police officer regarding the vehicle inventory procedures); *United States v. Betterton*, 417 F.3d 826, 830 (8th Cir. 2005) ("While a written policy may be preferable, testimony can be sufficient to establish police impoundment procedures."). When policies are not in writing, there may be evidentiary difficulties regarding whether a policy is, in fact, in place, and if so, what exactly is the policy.

There is irony here, too, in the lack of a requirement that the warrantless inventory search policy be in writing. One of the requirements of a traditional Fourth Amendment law is that a warrant be in writing. The writing requirement ensures there is no dispute regarding the showing of probable cause made by law enforcement officers or regarding the scope of the warrant itself. It prevents after-the-fact justifications by law enforcement. The notion that an *ex ante* writing prevents post hoc judgments has been an important part of search and seizure law for a long time. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 694, 105 S. Ct. 1568, 1580 (1985); *United States v. Martinez-Fuerte*, 428 U.S. 543, 565, 96 S. Ct. 3074, 3086 (1976); *Opperman*, 428 U.S. at 383, 96 S. Ct. at 3104; *United States v. Cazares-Olivas*, 515 F.3d 726, 729 (7th Cir. 2008). The United States Supreme Court's approach to unwritten policies in the field of warrantless inventory searches lacks these important disciplining features.

In considering whether to adopt the evolving enabling of warrantless inventory searches and seizures of automobiles espoused by the United States Supreme Court into our interpretation of article I, section 8 of the Iowa Constitution, it is important to recognize the United States Supreme Court's approach in its warrantless inventory search and seizure caselaw has been highly contested. The nature and scope of the disputed law may be seen in an overview of the majorities and dissents in

the warrantless inventory search and seizure cases. In several of the United States Supreme Court warrantless inventory search cases, the Court reversed decisions of state supreme courts limiting and regulating warrantless inventory searches under the Fourth Amendment. *See Bertine*, 479 U.S. at 376, 107 S. Ct. at 743; *Lafayette*, 462 U.S. at 648, 103 S. Ct. at 2610; *Opperman*, 428 U.S. at 376, 96 S. Ct. at 3100 (majority opinion). A more detailed look at the United States Supreme Court opinions in the warrantless inventory search and seizure cases illustrates some of the constitutional choices available to us in the interpretation of article I, section 8 of the Iowa Constitution.

The first case laying the foundations for warrantless inventory search and seizure, *Cady v. Dombrowski,* was a 5–4 decision. 413 U.S. 433, 450, 93 S. Ct. 2523, 2532 (1973). The owner of the vehicle, a police officer, was unable to arrange to have the vehicle towed and stored, and as a result, the police had it towed to a private garage. *Id.* at 446, 93 S. Ct. at 2530. The police searched the vehicle without a warrant pursuant to standard police department procedure, apparently to retrieve Dombrowski's service revolver, which was believed to be within the vehicle. *Id.* at 437, 93 S. Ct. at 2526. When searching for the weapon, police uncovered evidence in the vehicle incriminating Dombrowski in a murder. *Id.* The district court denied the motion to suppress, but the Seventh Circuit reversed. *Id.* at 434, 93 S. Ct. at 2525. A majority of the United States Supreme Court upheld the warrantless search as "reasonable" under the Fourth Amendment because the search was not part of a criminal investigation but was conducted pursuant to local police procedures for "community caretaking purposes." *Id.* at 447–48, 93 S. Ct. at 2531.

Writing for four justices, Justice Brennan dissented. *Id.* at 450, 93 S. Ct. at 2532 (Brennan, J., dissenting). He noted the "reasonableness" clause of the Fourth Amendment is "shaped by the warrant clause." *Id.* He rejected the majority's "fine-line" distinction between police intrusions for criminal and investigative functions. *Id.* at 453, 93 S. Ct. at 2534. Justice Brennan noted, "[T]he fact that the professed purpose of the contested search was to protect the public safety rather than to gain incriminating evidence does not of itself eliminate the necessity for compliance with the warrant requirement." *Id.* at 453–54, 93 S. Ct. at 2534. For Justice Brennan and the other dissenters, the formal labeling of a search and seizure as a criminal investigation or something else was of little significance: the resulting government intrusion into the privacy interests is the same. *See id.*

The United States Supreme Court was also highly divided in the next warrantless inventory search and seizure case. *Opperman*, 428 U.S. 364, 96 S. Ct. 3092. In *Opperman*, the majority of the court upheld a warrantless inventory search of a locked automobile that had been lawfully impounded for failure to pay parking tickets. *Id.* at 375–76, 96 S. Ct. at 3100. The car in question was towed to the city impound lot for parking violations. *Id.* at 366, 96 S. Ct. at 3095. A watch and other personal items were in the interior of the locked car but in plain view. *Id.* The police unlocked the car and conducted a warrantless inventory search, including opening an unlocked glove compartment where marijuana was discovered. *Id.* The owner of the car was subsequently charged with possession of marijuana and sought to suppress the evidence obtained by police in the search of the vehicle. *Id.* at 366, 96 S. Ct. at 3095–96. The South Dakota Supreme Court had found the search invalid under the Fourth Amendment because the warrantless

search was not incident to a lawful arrest, based on probable cause to believe the vehicle contained contraband, justified by the nature of the police custody of the vehicle, or based on exigent circumstances. *State v. Opperman*, 228 N.W.2d 152, 158 (S.D. 1975), *rev'd*, 428 U.S. 364, 96 S. Ct. 3092.

A five-member majority of the United States Supreme Court upheld the warrantless inventory search under the Fourth Amendment. *Opperman*, 428 U.S. at 376, 96 S. Ct. at 3100. The majority opinion by Chief Justice Burger emphasized automobiles are entitled to less protection than the home under the Fourth Amendment because of the mobility of a car, the lessened expectation of privacy in a car compared to the home, and the pervasive and continuing government regulation and control of cars. *Id.* at 367–68, 96 S. Ct. at 3096. The majority explained that conducting a routine inventory after impoundment promoted three distinct needs: protecting the owner's property, protecting the police against claims or disputes over lost or stolen property, and protecting the police from potential danger. *Id.* at 369–70, 96 S. Ct. at 3097. In light of these purposes, the majority concluded, inventories pursuant to standard police procedures are "reasonable" under the Fourth Amendment. *Id.* at 372, 96 S. Ct. at 3098–99.

Writing for three justices, Justice Marshall dissented. *Id.* at 384, 96 S. Ct. at 3105 (Marshall, J., dissenting); *see also id.* at 396, 96 S. Ct. at 3110 (White, J., dissenting). The dissent emphasized the warrantless inventory search was conducted of a closed glove compartment in a locked vehicle. *Id.* at 384–85, 96 S. Ct. at 3105 (Marshall, J., dissenting). While the dissent noted the court had occasionally distinguished automobiles from homes for search and seizure purposes, the distinction was based in part on the mobility of the car, a consideration not present

when the car is locked and impounded. *Id.* at 386, 96 S. Ct. at 3105–06. Further, the state's regulatory interest in the operation of automobiles is not implicated when the vehicle is immobilized in a police impoundment. *Id.* at 387, 96 S. Ct. at 3106.

The minority then considered the three justifications of the warrantless search presented in the majority opinion. *Id.* at 389, 96 S. Ct. at 3106–07. With respect to safety, the minority, citing a concurrence of Justice Powell, noted ordinarily "there is little danger associated with impounding unsearched automobiles," and in that case, there was no particularized concern over safety such as in *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968). *Opperman*, 428 U.S. at 390, 96 S. Ct. at 3107 (quoting *id.* at 377, 96 S. Ct. at 3101 (Powell, J., concurring)). On protecting the police from lost property claims, Justice Marshall noted the majority ignored the South Dakota Supreme Court state law interpretation that police, as "gratuitous depositors," are absolved "from any obligation beyond inventorying objects in plain view and locking the car." *Id.* at 391, 96 S. Ct. at 3108 (Marshall, J., dissenting). Further, again citing Justice Powell's concurring opinion, the minority doubted that an inventory would "work significantly to minimize the frustrations of false claims." *Id.* Finally, with respect to conducting an inventory for the owner's benefit, Justice Marshall noted law enforcement cannot assume consent. *Id.* at 392, 96 S. Ct. at 3108. According to Justice Marshall, a warrantless inventory search without consent may be conducted only upon a showing of a specific reason for the search and only after "the exhaustion and failure of reasonable efforts . . . to identity and reach the owner of the property in order to facilitate alternative means of security." *Id.* at 394, 96 S. Ct. at 3109.

Seven years after *Opperman*, the United States Supreme Court considered the validity of a warrantless preincarceration inventory search of a shoulder bag in *Lafayette*, 462 U.S. at 641–42, 103 S. Ct. at 2607. In *Lafayette*, police arrested the accused for disturbing the peace. *Id.* at 641, 103 S. Ct. at 2607. The *Lafayette* Court emphasized the practical necessities of jailhouse administration as supporting the search. *Id.* at 643–44, 103 S. Ct. at 2608. The Court emphasized the government's interest in preventing theft and false claims against employees and preserving the security of the stationhouse. *Id.* at 648, 103 S. Ct. at 2610. While the Illinois court found the search invalid because the government interest could have been advanced by the less intrusive means of sealing the container within another container and storing it in a secure locker, *People v. Lafayette*, 425 N.E.2d 1383, 1386 (Ill. Ct. App. 1981), the Court rejected the less-intrusive-means rationale. *Lafayette*, 462 U.S. at 648, 103 S. Ct. at 2610. The *Lafayette* Court emphasized the need for a "single familiar standard" in determining what may be searched and, to the *Lafayette* Court, that meant containers, bags, wallets—indeed everything. *Id.* at 648, 103 S. Ct. at 2610–11 (quoting *New York v. Belton*, 453 U.S. 454, 458, 101 S. Ct. 2860, 2863 (1981)). Justices Marshall and Brennan concurred, but stressed the government's strong interest in jailhouse security when a person is being admitted to the facility. *Id.* at 649, 103 S. Ct. at 2611 (Marshall, J., concurring).

The United States Supreme Court next considered a warrantless inventory search of an automobile in *Bertine*, 479 U.S. at 369–70, 107 S. Ct. at 740. The *Bertine* Court considered a police search of a backpack after the defendant was arrested for driving under the influence of alcohol and a tow truck was called to impound the vehicle.

*Id.* at 368–69, 107 S. Ct. at 739. The search of the backpack revealed controlled substances, cocaine paraphernalia, and a large amount of cash. *Id.* at 369, 107 S. Ct. at 739. The Colorado Supreme Court upheld a district court decision granting the motion to suppress. *Id.* at 370, 107 S. Ct. at 740.

The majority in *Bertine* reversed the Colorado Supreme Court and upheld the warrantless inventory search. *Id.* at 376, 107 S. Ct. at 743. The main opinion by Chief Justice Rehnquist recited the three rationales of warrantless inventory searches from *Opperman*. *Id.* at 372–73, 107 S. Ct. at 741–42. The majority rejected the approach of the Colorado Supreme Court, which held the search "was unreasonable because [the vehicle] was towed to a secured, lighted facility and because Bertine himself could have been offered the opportunity to make other arrangements for [the vehicle]." *Id.* at 373–74, 107 S. Ct. at 742. The *Bertine* Court also rejected the Colorado Supreme Court's balancing of the individual's privacy interest against the needs of law enforcement. *Id.* at 374–75, 107 S. Ct. at 742–43. According to the Court, there was a need for a single, familiar standard for police making the decision with limited time and expertise. *Id.* at 375, 107 S. Ct. at 743. The Court noted, however, a warrantless inventory search or seizure might be invalid if the owner or driver could show that the action was "in bad faith or for the sole purpose of investigation." *Id.* at 372, 107 S. Ct. at 742.[1]

A concurring opinion by Justice Blackmun, joined by Justices Powell and O'Connor, emphasized the opening of closed containers in a warrantless inventory search is acceptable only if conducted pursuant to

---

[1]*But see United States v. Judge*, 864 F.2d 1144, 1147 n.5 (5th Cir. 1989) (observing there are "mixed motives in the vast majority of inventory searches" and noting the difficulty of establishing bad faith).

standardized police procedures. *Id.* at 376, 107 S. Ct. at 743 (Blackmun, J., concurring). According to the concurring opinion, standardized procedures are required because police should not be vested "with discretion to determine the scope of the inventory search." *Id.*

Justice Marshall, joined by Justice Brennan, dissented. *Id.* at 377, 107 S. Ct. at 744 (Marshall, J., dissenting). While the majority emphasized the lack of discretion in implementing the inventory procedures, Justice Marshall noted the procedures themselves, in fact, vested substantial discretion in the officers to choose whether to park and lock the vehicle or impound it. *Id.* at 378–79, 107 S. Ct. at 744–45. Justice Marshall reprised the argument from earlier dissents that the alleged interests supporting warrantless inventory searches were not substantial. *Id.* at 382–85, 107 S. Ct. at 746–48. As to preservation of the owner's property, Justice Marshall emphasized in this case the owner was available to make other arrangements, yet the police made no effort to determine whether he wanted them to "safeguard" his property. *Id.* at 385, 107 S. Ct. at 748. Justice Marshall recognized *Lafayette* upheld a stationhouse inventory of a bag, but the case was justified by the compelling government interests unique to the stationhouse, preincarceration context where jail security is paramount. *Id.* at 385–86, 107 S. Ct. at 748–49.

The final warrantless inventory search and seizure case in the line of cases is *Wells*, 495 U.S. 1, 110 S. Ct. 1632. In *Wells*, a splintered Court considered a case in which police searched the trunk and a suitcase within it, after arresting the driver for driving while intoxicated. *Id.* at 2, 110 S. Ct. at 1634. The majority of the Supreme Court held the search offended the Fourth Amendment because law enforcement involved in the search had no policy whatsoever "with respect to the

opening of closed containers encountered during an inventory search." *Id.* at 4–5, 110 S. Ct. at 1635. In dicta, however, the majority opinion suggested a law enforcement policy might allow law enforcement the discretion to determine whether to open closed containers in seized automobiles. *Id.* at 4, 110 S. Ct. at 1635.

Justice Brennan, joined by Justice Marshall, concurred. *Id.* at 5, 110 S. Ct. at 1635 (Brennan, J., concurring). Justice Brennan emphasized that under *Opperman* the procedures of law enforcement must limit the discretion of police. *Wells*, 495 U.S. at 8, 110 S. Ct. at 1637. Justice Brennan stressed that opening a closed container is a great intrusion into the privacy of the owner when the container is found in an automobile. *Id.* at 9, 110 S. Ct. at 1638. Justice Brennan repeated his view espoused in *Bertine* that absent consent or an emergency, police may not open a closed container found during an inventory search of an automobile. *Id.* at 8–9, 110 S. Ct. at 1637–38.

The United States Supreme Court has not revisited the issue of inventory searches since *Wells*. There is reason to think some of the rationale for the Supreme Court's inventory search approach has been undermined by later decisions. In *Arizona v. Gant*, the Court held where suspects are detained and away from a motor vehicle, officer safety is not a realistic basis for a warrantless search of the passenger compartment of an automobile. 556 U.S. 332, 344, 129 S. Ct. 1710, 1719 (2009). In light of *Gant*, it is unclear whether the Supreme Court would continue to find safety supports a warrantless search of a car that is securely impounded. *See* Jennifer Kirby-McLemore, Comment, *Finishing What* Gant *Started: Protecting Motorists' Privacy Rights by Restricting Vehicle Impoundments and Inventory Searches*, 84 Miss. L.J. 179, 196–97 (2014).

As can been seen by the above cases, the question of the nature and scope of permitted warrantless inventory searches and seizures involving automobiles has been a highly contested issue. In three of the cases, the United States Supreme Court reversed state appellate decisions from Colorado, Illinois, and South Dakota. *Bertine*, 479 U.S. at 376, 107 S. Ct. at 743 (majority opinion); *Lafayette*, 462 U.S. at 649, 103 S. Ct. at 2611 (majority opinion); *Opperman*, 428 U.S. at 376, 96 S. Ct. at 3100–01 (majority opinion). The majority opinions in *Bertine* and *Opperman* were highly contested and provoked vigorous dissents. In construing our state constitutional provisions relating to search and seizure, we are free to consider the persuasive power of the prior state court opinions and the majority, concurring, and dissenting opinions in the United States Supreme Court cases.

4. *Post*-Bertine a*lternative approaches of state supreme courts to inventory searches.* After *Bertine,* some state courts have followed lockstep with the United States Supreme Court precedent in considering warrantless inventory searches and seizures involving automobiles under their state constitutions. *See, e.g.*, *People v. Parks,* 370 P.3d 346, 351 (Colo. App. 2015) ("[T]he State and Federal constitutions are coextensive in the context of inventory searches."); *Weide*, 455 N.W.2d at 904 ("In light of *Bertine* [prior caselaw rejecting inventory searches of closed containers] is no longer a correct interpretation of state or federal constitutional law, and we overrule [prior caselaw] to the extent that it conflicts with *Bertine*."); *Johnson v. State*, 137 P.3d 903, 908–09 (Wyo. 2006) ("Consonant with the Fourth Amendment, the opening of closed containers during an inventory search is permissible if conducted in good faith, pursuant to a standardized police policy, and as long as the search is not a ruse for general rummaging for evidence of a crime.").

Other state supreme courts, however, have chosen alternative approaches reminiscent of state court cases prior to *Bertine*. Indeed, on remand from the United States Supreme Court, the South Dakota Supreme Court dug in its heels and adhered to its prior view that the inventory search was unlawful under the South Dakota Constitution. *State v. Opperman*, 247 N.W.2d 673, 675 (S.D. 1976). The South Dakota Supreme Court noted "logic and a sound regard for the purposes of the protection" of the search and seizure provision of the South Dakota Constitution "warrant a higher standard of protection for the individual . . . than the United States Supreme Court found necessary under the Fourth Amendment." *Id.* The South Dakota Supreme Court observed that for a warrantless inventory search to be reasonable under the South Dakota Constitution there must be "minimal interference" with the individual's protected rights. *Id.* (*quoting United States v. Lawson*, 487 F.2d 468, 475 (8th Cir. 1973)). The South Dakota Supreme Court limited the warrantless inventory search under the search and seizure provision of article VI, section 11 of the South Dakota Constitution to articles within plain view. *Id.*

Appellate courts in the state of Washington have developed their own independent state constitutional analysis of the validity of warrantless inventory searches and seizures. In a pre-*Bertine* case, the Washington Supreme Court held before warrantless impoundment occurs pursuant to the police's community caretaking function, the police must first make an inquiry as to the availability of the owner or the owner's spouse or friends to move the vehicle under the Fourth Amendment. *State v. Williams*, 689 P.2d 1065, 1070–71 (Wash. 1984) (en banc). The *Williams* court also noted, "[I]t is doubtful that the police could have conducted a routine inventory search without asking [the

defendant] if he wanted one done." *Id.* at 1071. In another pre-*Bertine* case, the Washington Supreme Court held a closed container could not be opened pursuant to an inventory search, this time invoking both the Fourth Amendment and the search and seizure provisions of the Washington Constitution. *State v. Houser*, 622 P.2d 1218, 1226 (Wash. 1980) (en banc). After *Bertine,* the Washington courts have continued to limit the scope of warrantless inventory searches and seizures under the search and seizure provisions of the Washington Constitution, holding when conducting an inventory, no closed, opaque containers should be opened unless the container is designed to or likely to contain valuables. *State v. Wisdom*, 349 P.3d 953, 965 (Wash. Ct. App. 2015). While Washington state courts recognize warrantless inventory searches may serve legitimate government interests, the courts have emphasized that warrantless searches are not limitless and do not outweigh the privacy interests of Washington citizens under the search and seizure provisions of the Washington Constitution. *State v. White*, 958 P.2d 982, 987 (Wash. 1998). Further, the post-*Bertine* Washington Supreme Court has suggested warrantless inventory searches should be consent-based with the owner or driver able to refuse. *Id.* at 987 n.11.

Another post-*Bertine* state court approach to warrantless inventory searches may be found in the Oregon case of *Hite*, 338 P.3d 803. Under the Oregon court's approach, property is to be listed in an inventory only by its outward appearance. *Id.* at 809. Under the search and seizure provisions of the Oregon Constitution, closed, opaque containers may not be opened unless the container is designed or likely to contain valuables. *Id.* Similarly, in *State v. Atkinson,* an Oregon appellate court expressly departed from *Opperman* under the search and seizure provisions of the Oregon Constitution in holding there was no need for a warrantless

inventory search of a vehicle that was in a locked shed where there was no evidence of past thefts. 669 P.2d 343, 345–46 (Or. Ct. App. 1983) (en banc), *aff'd on other grounds*, 668 P.2d 832, 838 (Or. 1984) (en banc).

The caselaw from Indiana is also instructive. Like Iowa precedent, Indiana precedent requires the search and seizure provision of the Indiana Constitution "be liberally construed in its application to guarantee that people will not be subjected to unreasonable search and seizure." *Lucas*, 859 N.E.2d at 1251; *see State v. Height*, 117 Iowa 650, 657, 91 N.W. 935, 937 (1902) (stating Iowa constitutional rights should be applied "in a broad and liberal spirit"). The Indiana appellate court applied a "totality of the circumstances" test under its state constitution to determine if the search was reasonable, an approach the United States Supreme Court expressly declined to follow in *Bertine*. *Compare Lucas*, 859 N.E.2d at 1251, *with Bertine*, 479 U.S. at 375, 107 S. Ct. at 743 (majority opinion) (emphasizing when a search is underway, a "single familiar standard is essential" as opposed to one that balances individual interests in specific circumstances). The Indiana Supreme Court determined opening a locked toolbox as part of an inventory search was unreasonable under article I, section 11 of the Indiana Constitution. *Lucas*, 859 N.E.2d at 1251.

There is authority in Texas that departs from the United States Supreme Court's approach to warrantless inventory searches of automobiles. In *Gords v. State*, a post-*Bertine* Texas court of appeals held there was no basis for impounding a vehicle that was parked in a private lot and locked, where there were other people at the arrest site who could have taken care of the vehicle and no contraband or visible evidence of crime was in plain view. 824 S.W.2d 785, 788 (Tex. Crim. App. 1992). The Texas court explicitly noted that *Bertine* was not

binding authority in the interpretation of the search and seizure provisions of the Texas Constitution. *Id.* at 787.

Similarly, in *Autran v. State,* the Texas Court of Criminal Appeals concluded a warrantless inventory of contents of a vehicle, including a closed ice chest, a cardboard box, a shopping bag, and a closed plastic key box, did not violate the Fourth Amendment. 887 S.W.2d 31, 35–36 (Tex. Crim. App. 1994) (en banc). Noting it was imperative the court engage in an independent analysis under the search and seizure provisions of the Texas Constitution, the *Autran* court concluded under the Texas Constitution the owner or driver's privacy interest in closed containers is not overcome by the general policy considerations underlying a warrantless inventory search of closed containers in an automobile. *Id.* at 41–42. According to the *Autran* court, the state's interest in protecting the owner or driver's property, as well as protecting the police from danger and false claims of theft, may be satisfied by recording the existence of, or describing and or photographing the existence of, the closed or locked container. *Id.* at 42. The *Autran* court refused to "presume the search of a closed container reasonable" under the search and seizure provisions of the Texas Constitution "simply because an officer followed established departmental policy." *Id.*

Finally, cases from New Jersey also go in a different direction than the United States Supreme Court. In *State v. Slockbower,* the New Jersey Supreme Court held that before police impounded a vehicle, the driver either must consent or be given a reasonable opportunity to make other arrangements for custody of the vehicle. 397 A.2d 1050, 1051 (N.J. 1979). The approach in *Slockbower* was affirmed in *Mangold,* 414 A.2d at 1318. In *Mangold,* the New Jersey Supreme Court held that before impounding a vehicle, the driver is entitled to an opportunity to

utilize available alternative means to safeguard his or her property. *Id.* The *Slockbower–Mangold* reasoning has been applied in post-*Bertine* cases in *State v. One 1994 Ford Thunderbird,* 793 A.2d 792, 801 (N.J. Super. Ct. App. Div. 2002), and *Blacknall v. Simonetti,* 2010 WL 2089773 at *3 (N.J. Super. Ct. App. Div. 2010). *See also State v. Robinson*, 159 A.3d 373, 387 (N.J. 2017) (citing *Slockbower* and *Mangold* for the standard of when an inventory search may be conducted under the New Jersey Constitution).

Many of the cases departing from federal precedent cite or are generally consistent with the Police Foundation's Rule 603B of the 1974 Model Rules[:] Searches Seizures and Inventories of Motor Vehicles. Rule 603B provides the arresting officer should be required to advise the arrested operator "that his vehicle will be taken to a police facility or private storage facility for safekeeping unless he directs the officer to dispose of it in some other lawful manner" and to tell the arrested operator that the arresting officer will "comply with any reasonable alternative disposition requested." *See* 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.3(c), at 820 (5th ed. 2012) [hereinafter LaFave, *Search and Seizure*] (quoting Model Rules[:] Searches Seizures and Inventories of Motor Vehicles (Project on Law Enf't Policy & Rulemaking 1974)).

5. *Iowa Supreme Court's approach to inventory searches.* The question of warrantless inventory searches and seizures involving automobiles was considered thirty-five years ago in *State v. Roth*, 305 N.W.2d 501, 502 (Iowa 1981). In a divided opinion, the court in *Roth* held that under the Fourth Amendment and article I, section 8 of the Iowa Constitution, police may open a closed container such as a paper bag but not a purse, suitcase, or briefcase that could be removed from

the vehicle and inventoried as a unit. *Id.* at 507–08. In a dissenting opinion, Justice McCormick would have held the search of a paper bag found in the truck was invalid under both the Fourth Amendment and the Iowa Constitution. *Id.* at 510 (McCormick, J., dissenting). Notably, the privacy protections in *Roth* went considerably further than the United States Supreme Court ultimately afforded owners and drivers in *Bertine.* *Id.* at 508 (majority opinion); *Bertine,* 479 U.S. at 375, 107 S. Ct. at 743. The difference between a searchable paper bag and a closed container not subject to search was not explored in depth. *Id.* at 508.

Three years later, another warrantless inventory case reached us in *State v. Kuster,* 353 N.W.2d 428, 430 (Iowa 1984), *overruled by State v. Huisman,* 544 N.W.2d 433, 440 (Iowa 1996). In *Kuster,* a Fourth Amendment case, we held there must be a "showing [of] some reasonable necessity" for the warrantless impoundment of an automobile. *Id.* at 432 (quoting *State v. McDaniel,* 383 A.2d 1174, 1179 (N.J. Super. Ct. App. Div. 1978)). We noted "the vehicle was locked, legally parked, and it presented no danger to the public." *Id.* Further, we emphasized there was no attempt "by the police to allow the defendant to provide for the care of the vehicle and apparently no inquiry was made of him as to what he wanted to have done with the vehicle." *Id.* In short, prior to *Bertine,* we adopted the view of a number of state courts, namely, that before a warrantless impoundment occurs, there must be some risk if impoundment does not occur and the driver or owner of the vehicle must be given a chance to make other arrangements.

After the United States Supreme Court decided *Bertine,* we considered a warrantless inventory search in *Huisman,* 544 N.W.2d 435. In this case, police conducted a warrantless inventory search of a vehicle in a motel parking lot. *Id.* The defendant challenged the warrantless

search under the Fourth Amendment. *Id.* at 436. In *Huisman,* we recognized the United States Supreme Court in *Bertine* rejected a case-by-case analysis of reasonable necessity of impoundment in favor of a broader approach that a warrantless inventory search and seizure may be conducted pursuant to generally applicable police policy. *Id.* at 437. Although our view in *Kuster* of the requirements of the Fourth Amendment was different from the *Bertine* decision, we were obliged to abandon *Kuster* and follow *Bertine* by operation of the Supremacy Clause of the United States Constitution. *Id.* at 438–39. While we might have stood our ground as enunciated in *Kuster* under article I, section 8 of the Iowa Constitution, no state constitutional claim was raised in *Huisman. Id.* at 435.

Similarly, in *State v. Aderholdt,* we considered a Fourth Amendment challenge to a warrantless inventory search where the initial stop was made because of a seatbelt violation and excessively tinted windows. 545 N.W.2d 559, 563 (Iowa 1996). Citing *Bertine,* we upheld the search as being conducted according to standardize procedures and not in bad faith. *Id.* at 564–66. As with *Huisman,* no state constitutional claim was presented in the case, and we were thus obliged by the Supremacy Clause to follow the United States Supreme Court warrantless inventory search and seizure precedents. *See id.* at 565.

**B. Discussion.**

1. *The convergence of search and seizure cases geometrically undermines privacy in automobile searches.* This case must be considered in the context of a disturbing trend related to traffic stops in the federal caselaw. At the outset, as noted by Justice Kennedy, just about anyone if followed for a few blocks may be arrested for traffic infractions. *Maryland v. Wilson,* 519 U.S. 408, 423, 117 S. Ct. 882, 890

(1997) (Kennedy, J., dissenting). The United States Supreme Court has held that in making the discretionary choice to make a traffic stop, law enforcement's subjective motivation is not subject to review. *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996). Once the police have made the virtually unreviewable discretionary decision to stop a vehicle, the driver may be arrested for a minor traffic violation, even if the violation is not punishable by a jail term. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S. Ct. 1536, 1557 (2001). Then, pursuant to an impoundment under a written or even unwritten policy, law enforcement may engage in a thorough search of the vehicle, including opening closed containers. *Bertine*, 479 U.S. at 375, 107 S. Ct. at 743.

The end result of *Whren*, *Atwater*, and *Bertine* is law enforcement has virtually unlimited discretion to stop arbitrarily whomever they choose, arrest the driver for a minor offense that might not even be subject to jail penalties, and then obtain a broad inventory search of the vehicle—all without a warrant. When considered in context, the inventory search does not emerge as something for the benefit of the owner or driver, but instead is a powerful unregulated tool in crime control.[2]  *See* David A. Harris, *"Driving While Black" and All Other Traffic*

---

[2]There is empirical evidence police disproportionately focus on minorities in street encounters and traffic stops. *See* Charles R. Epp, et al., *Pulled Over: How Police Stops Define Race and Citizenship* 155, 167 (2014) (surveying random sampling of adult drivers in Kansas City metro area, finding African-Americans more than three times as likely to be stopped in investigatory, as opposed to safety enforcement, police stops); Frank R. Baumgartner, et al., *Racial Disparities in Traffic Stop Outcomes*, 9 Duke Forum for L. & Soc. Change 21, 34 (2017) (using publicly available information from 132 police agencies across sixteen states, finding nationally, on average, Hispanic and African-American drivers were searched at more than double the rate of white drivers during routine traffic stops); Angela J. Davis, *Race, Cops, and Traffic Stops*, 51 U. Miami L. Rev. 425, 431–32 (1997) (citing statistics from New Jersey, Maryland, and Florida indicating approximately 70% of the motorists stopped were African-American, and, in

*Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 559 (1997); Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1902–05 (2004); Arnold H. Loewy, *Cops, Cars, and Citizens: Fixing the Broken Balance*, 76 St. John's L. Rev. 535, 544–45 (2002) [hereinafter Loewy] (noting an inventory search, "[w]hen coupled with an unchanneled power to arrest for traffic offenses, . . . powerfully contributes to the broken balance between police and citizens" (footnote omitted)); William J. Mertens, *The Fourth Amendment and the Control of Police Discretion*, 17 U. Mich. J.L. Reform 551, 564 (1984).[3]  A warrantless inventory search and seizure seems more like a law enforcement weapon than a benign service to citizens.

An essentially unregulated legal framework allowing wide police discretion in stopping, arresting, and conducting warrantless inventory searches of the driver's automobile amounts to a general warrant regime that is anathema to search and seizure law.  *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 669, 115 S. Ct. 2386, 2398 (1995) (O'Connor, J., dissenting) (explaining how the warrant requirement was chosen by the framers of the Constitution to curb the abuses of the general warrant); *Ochoa*, 792 N.W.2d at 271–72 (describing the hated general warrants in

the case of Florida, African-American or Hispanic); Peter Hanink, *Don't Trust the Police: Stop Question Frisk, COMPSTAT, and the High Cost of Statistical Over-Reliance in the NYPD*, 2013 J. Inst. Just. Int'l Stud. 99, 102–03 (2013) (examining data collected by NYPD, finding racial minorities are stopped at a disproportional rate).

[3]There is good reason to believe law enforcement may see warrantless inventory searches as an end run around usual warrant requirements.  For example, after *Gant*, the Federal Law Enforcement Training Center issued a ten-page report that, among other things, emphasized while the entire passenger compartment could no longer be searched under the previous *Belton* rule, a full search of the interior may be accomplished through an inventory search.  *See* Jennifer G. Solari, *The United States Supreme Court's Ruling in* Arizona v. Gant: *Implications for Law Enforcement Officers*, May 2009 Fed. L. Enf't Informer 3, 8 (2009).

England and the American colonies); Barbara C. Salken, *The General Warrant of the Twentieth Century? A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses*, 62 Temp. L. Rev. 221, 256–58 (1989) (comparing unfettered discretion to arrest for traffic violations to general warrants and writs of assistance in the revolutionary era). Such an unregulated atmosphere leads to a real risk that persons subject to stops, arrest, and searches may be selected arbitrarily or based upon impermissible criteria such as racial profiling. *See State v. Tyler*, 830 N.W.2d 288, 297 n.4 (Iowa 2013) (noting "the possibility for racial profiling requires us to carefully review the objective basis for asserted justifications behind traffic stops"); *Pals*, 805 N.W.2d at 772 & n.5 (discussing racial profiling claims in traffic stops).

2. *Independent interpretation of search and seizure cases under article I, section 8 of the Iowa Constitution.* The warrantless inventory search and seizure cases involving automobiles are consistent with a recent departure of the United States Supreme Court from the traditional warrant preference to an open-ended and free-floating "reasonableness requirement." *See Illinois v. Rodriguez*, 497 U.S. 177, 198, 110 S. Ct. 2793, 2806–07 (1990) (Marshall, J., dissenting) ("Where this free-floating creation of 'reasonable' exceptions to the warrant requirement will end, now that the Court has departed from the balancing approach that has long been part of our Fourth Amendment jurisprudence, is unclear."); Phyllis T. Bookspan, *Reworking the Warrant Requirement: Resuscitating the Fourth Amendment*, 44 Vand. L. Rev. 473, 474–80 (1991). The Supreme Court used to say that the touchstone to the Fourth Amendment was the warrant requirement, subject to very limited exceptions. *See Katz*, 389 U.S. at 356–57, 88 S. Ct. at 514; *Johnson v. United States*, 333 U.S. 10, 14–15, 68 S. Ct. 367, 369 (1948). Under the

innovations introduced in recent years, the United States Supreme Court has now downgraded and demoted the warrant requirement and declared the touchstone to Fourth Amendment analysis is a general, free-floating reasonableness standard which has no relationship to the warrant requirement of the Fourth Amendment and may, in fact, override it. *Rodriguez*, 497 U.S. at 198, 110 S. Ct. at 2806; Jack Wade Nowlin, *The Warren Court's House Built on Sand: From Security in Persons, Houses, Papers, and Effects to Mere Reasonableness in Fourth Amendment Doctrine*, 81 Miss. L.J. 1017, 1057–60 (2012). As a result, litigants have looked to state supreme courts to adjust the balance, with some notable success.[4] *See* Loewy, 76 St. John's L. Rev. at 579; *see generally* Stephen E. Henderson, *Learning from All Fifty States: How to Apply the Fourth Amendment and Its State Analogs to Protect Third Party Information from Unreasonable Search*, 55 Cath. U.L. Rev. 373 (2006).

While the United States Supreme Court has departed from the traditional warrant preference approach under the Fourth Amendment, we have declined to do so under the search and seizure provision of article I, section 8 of the Iowa Constitution. Our recent cases repeatedly embrace what can only be characterized as a strong warrant preference interpretation of article I, section 8. *Gaskins*, 866 N.W.2d at 9 (" 'A warrantless search is presumed unreasonable' unless an exception applies." (quoting *State v. Moriarty*, 566 N.W.2d 866, 868 (Iowa 1997));

---

[4]*See, e.g.*, *State v. Sullivan*, 74 S.W.3d 215, 222 (Ark. 2002) (declining to follow United States Supreme Court approach on remand from *Arkansas v. Sullivan*, 532 U.S. 769, 121 S. Ct. 1876 (2001)); *Sitz v. Dep't of State Police*, 506 N.W.2d 209, 224–25 (Mich. 1993) (declining to follow *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S. Ct. 2481 (1990)); *State v. Robinette*, 685 N.E.2d 762, 771–72 (Ohio 1997) (declining to follow *Ohio v. Robinette*, 519 U.S. 33, 117 S. Ct. 417 (1996)); *Opperman*, 247 N.W.2d at 675 (declining to follow *Opperman*, 428 U.S. 364, 96 S. Ct. 3092).

*Short*, 851 N.W.2d at 502 ("We have little interest in allowing the reasonableness clause to be a generalized trump card to override the warrant clause in the context of home searches."); *Baldon*, 829 N.W.2d at 791 ("It is well-settled that warrantless searches are virtually 'per se unreasonable . . . .' "); *Ochoa*, 792 N.W.2d at 269 ("[T]he Reasonableness Clause cannot be used to override the Warrant Clause."). Thus, while the United States Supreme Court in recent years has relaxed the grip of the traditional warrant requirement to advance the claimed interests of law enforcement, we have held firm in protecting privacy interests through a robust warrant requirement.

Further, to the extent open-ended standards like reasonableness are applicable to search and seizure law, we have tended to apply open-ended standards more stringently than federal caselaw. This principle is illustrated in *Pals*, 805 N.W.2d at 767. In that case, Pals was stopped for a minor civil infraction. *Id.* at 769. When Pals was in the squad car awaiting an uncertain fate after being subjected to a *Terry*-type pat-down, the officer extracted consent to conduct a warrantless search of Pals' truck, which yielded drugs. *Id.* at 770. On the issue of consent, we reserved for another day the issue of whether we should abandon the fuzzy, multifactored approach to consent endorsed by the United States Supreme Court in *Schneckcloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047–48 (1973), in favor of a bright-line rule that police must advise an individual of his right to refuse a search in order for the consent to be knowing and voluntary. *Pals*, 805 N.W.2d at 782; *see Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938) (advocating a bright-line consent rule). Instead, we applied the *Schneckcloth* factors stringently and found the consent could not be considered voluntary. *Pals*, 805 N.W.2d at 782–83.

3. *Evaluation of privacy interest in closed containers in automobiles.* In addition to emphasizing the traditional warrant requirement and more stringently applying open-ended reasonableness concepts in search and seizure law, we have also departed from federal precedent in the evaluation of the strength of competing interests involved in warrantless inventory searches of automobiles. Federal caselaw has tended to minimize the strength of the privacy interest in the interior of automobiles, but in *Gaskins,* we took a different approach. 866 N.W.2d 13–14. In *Gaskins,* we held a warrantless search of a container in a validly stopped automobile was not a search incident to arrest and therefore violated article I, section 8 of the Iowa Constitution. *Id.* at 16–17. We noted in that context article I, section 8 protected reasonable expectations of privacy and that the Iowa framers placed considerable value on the sanctity of private property. *Id.* at 16.

As noted by a special concurrence in *Gaskins,* "there is a split of authority on the question of whether there is a broad automobile exception" to search and seizure provisions under state constitutions. *Id.* at 38 (Appel, J., concurring specially). The *Gaskins* concurrence explained that automobiles are used for more than mere transportation. *Id.* at 37. The concurring opinion noted that "[g]love compartments and consoles are pretty good places to keep 'papers and effects.'" *Id.* The concurrence pointed out that automobiles are often used as mobile offices and may contain all manner of private materials. *Id.* Professor LaFave has emphasized that a party's personal effects stored in an automobile are entitled to constitutional protection. LaFave, *Search and Seizure* § 7(2)(b), at 734–38. While it may be that the home is entitled to greater protection because of enhanced privacy concerns, we think that owners and drivers have a substantial privacy interest in "papers and

effects" that may be found within the passenger compartment, glove compartment, or trunk of an automobile.

4. *Evaluation of law enforcement interests supporting warrantless inventory searches and seizures of automobiles.* We have not recently examined the weight of the state's interest in protecting the property in impounded vehicles or of protecting the police from false claims. *Cf. Lafayette*, 462 U.S. at 646, 103 S. Ct. at 2609 (suggesting that arrested persons "have been known" to make false claims of theft). It may be true, as stated in *Lafayette*, that "[i]t is not unheard of for persons employed in police activities to steal property taken from arrested persons," *id.*, but the remote possibility by itself does not establish a strong government interest. We think the interest is insubstantial for several reasons.

First, the risk of a false-claim loss is not very great. Any false claim would have to overcome difficult facts if the automobile is locked and stored in a secure impoundment facility. *See Hite*, 669 P.2d at 345–46 (noting shed where police placed impounded vehicles was locked and there was no evidence of past thefts at the location). The State has not cited, and we have not found, any empirical evidence that false claims are a serious problem. Indeed, in *Lafayette*, the minimal and not very convincing observation was made that such claims "were not unheard of." 462 U.S. at 646, 103 S. Ct. at 2609. The mere theoretical possibility of a rare and in almost all cases unsuccessful claim of theft cannot overcome the substantial expectation of privacy an owner or driver has in the contents of an automobile.

Second, to the extent there is a minimal false-claim problem, a written inventory of property by police is not a very effective way of dealing with it. *See Opperman*, 428 U.S. at 391, 96 S. Ct. at 3108

(Marshall, J., dissenting) ("[I]t may well be doubted than an inventory procedure would in any event work significantly to minimize the frustrations of false claims."). A party determined to make a false claim may simply allege that the valuables were not included in the written inventory, either through mistake or design. Or, as Justice Powell pointed out in his *Opperman* concurrence, claimants could allege that the missing items were stolen prior to the inventory. *Id.* at 378–79, 96 S. Ct. at 3102 (Powell, J., concurring).

Third, there are other equally or more effective methods in securing property other than a warrantless inventory search. Containers inside the vehicle may simply be sealed and stored. *Mozzetti*, 484 P.2d at 89. Such a process would provide at least as much protection to the remote threat as a warrantless inventory search of containers. *United States v. Bloomfield*, 594 F.2d 1200, 1203 (8th Cir. 1979).

Finally, under Iowa law, involuntary or gratuitous bailees of another's property are not responsible for its loss unless guilty of gross negligence in its keeping. *Siesseger v. Puth*, 213 Iowa 164, 177–78, 239 N.W. 46, 52 (1934); *Sherwood v. Home Sav. Bank*, 131 Iowa 528, 536, 109 N.W. 9, 12 (1906); *Estate of Martin*, No. 11–0690, 2012 WL 1431490 at *4–5 (Iowa Ct. App. 2012); *Khan v. Heritage Prop. Mgmt.*, 584 N.W.2d 725, 730 n.4 (Iowa Ct. App. 1998). It is striking that while the South Dakota Supreme Court emphasized the limited exposure of law enforcement to theft claims as a gratuitous bailee, *Opperman*, 228 N.W.2d at 159, the majority of the United States Supreme Court in *Opperman* ignored the limitation, *see* 428 U.S. at 369, 96 S. Ct. at 3097 (majority opinion). The very limited exposure of police when serving as an involuntary or gratuitous bailee has been cited as undercutting the liability rationale for a warrantless inventory search. *See, e.g., United*

*States v. Lyons*, 706 F.2d 321, 334 n.21 (D.C. Cir. 1983) (questioning in dicta the reliance in *Opperman* on the rationale of protecting the police from false claims because the police would be involuntary bailees of the automobile who would have a slight duty of care); *Reeves v. State*, 599 P.2d 727, 736–37 (Alaska 1979) ("[T]he state, as an involuntary bailee, has 'only a slight duty of care' with respect to property in its possession because of the arrest of the property owner and this 'duty could easily be met without extensive inventory.' " (quoting *Daniel*, 589 P.2d at 415)); *Mozzetti*, 484 P.2d at 89–90 (holding police as involuntary bailees are not liable for ordinary negligence and have a duty to use only slight care in protecting the bailment); *State v. Ching*, 678 P.2d 1088, 1093 (Haw. 1984) (holding in evaluating constitutionality of inventory search, it is important that gratuitous bailee is liable only for gross negligence or bad-faith loss); *Herring v. State*, 404 A.2d 1087, 1091–92 (Md. Ct. App. 1979) (discussing the duty owed by the police to safeguard the contents of an impounded vehicle and rejecting the argument that an inventory search was necessary to protect the contents of the car because the police are gratuitous or involuntary bailees); *White*, 958 P.2d at 986 n.9 ("When the police impound a vehicle they become involuntary bailees."); *State v. Singleton*, 511 P.2d 1396, 1400 (Wash. Ct. App. 1973) (holding that when the police impound a car, they thereby become involuntary bailees); *see also* 3 LaFave, *Search and Seizure* § 7.4(a), at 842 & n.47 (noting "[a]s for the protection-against-claims argument, certainly security measures short of inventory will suffice to protect against tort claims" and citing *Mozzetti*, 484 P.2d 84, for the proposition that as involuntary bailees, police adequately fulfill their duty by rolling up the windows and locking the doors of impounded vehicles).  The fact that state law minimized the liability exposure of involuntary or gratuitous bailees was a factor when

the South Dakota Supreme Court declined to follow the United States Supreme Court on remand in the *Opperman* case. *See Opperman*, 247 N.W.2d at 675 (rejecting search under South Dakota Constitution); *Opperman*, 228 N.W.2d at 159 (explaining that police act as "gratuitous depositors" when in possession of impounded car and state law requires "slight care for the preservation of the thing deposited").

Based on the above reasons—the minimal risk, the limited effectiveness of inventories, the availability of other equally effective but less intrusive options, and the limited exposure of gratuitous bailees— the State's interest in protecting itself from false claims is at best insubstantial.

We now turn to an examination of the second justification of inventory searches, police safety.[5] Where the driver or owner is separated from the vehicle, and the vehicle is securely impounded, there is little risk. In *Gant*, the United States Supreme Court clarified that when an automobile is stopped, the risk of harm is not a basis for search of the passenger compartment when the driver is secure in the backseat of a police vehicle. 556 U.S. at 344, 129 S. Ct. at 1719. Justice Scalia characterized the assertion of officer safety supporting automatic searches of automobiles regardless of the proximity of the driver and others to the interior of the car was a "charade of officer safety." 556 U.S. at 353, 129 S. Ct. at 1725 (Scalia, J., concurring).

In *Gaskins*, we applied the *Gant* principles in the context of an automobile search, rejecting a safety rationale when the driver was separated from the vehicle. *Gaskins*, 866 N.W.2d at 16–17 (majority

---

[5]In *Opperman*, the safety rational was advanced in Justice Burger's plurality opinion. 428 U.S. at 370, 96 S. Ct. at 3097. The dissenters, as well as Justice Powell in concurrence, did not agree with the rationale. *Id.* at 378, 96 S. Ct. at 3101–02 (Powell, J., concurring); *id.* at 389, 96 S. Ct. at 3107–08 (Marshall, J., dissenting).

opinion).  An impounded vehicle is similarly remote from the owner or driver.  If the police may engage in warrantless searches of automobiles in inventory to protect the police, the same reasoning would allow a warrantless search of any locked and parked automobile to protect the public.  *See* 3 LaFave, *Search and Seizure* § 7(a), at 843.  A search of all cars that happen to be impounded without any showing at all regarding potential safety issues is akin to a general warrant.  *See* Gerald S. Reamy, Michael H.J. Bassett, & John A. Molchan, *The Permissible Scope of Texas Automobile Inventory Searches in the Aftermath of* Colorado v. Bertine*: A Talisman Is Created*, 18 Texas Tech. L. Rev. 1165, 1183 (1987).  Further, where containers are involved, it is difficult to see danger arising by a requirement that containers not be searched but stored as a unit without specific knowledge of their contents for safekeeping.  *Bloomfield*, 594 F.2d at 1203.  With respect to the danger justification for inventory searches, Professor LaFave has observed that "it is difficult to take this contention seriously."  3 LaFave, *Search and Seizure* § 7.4(a) n.18, at 835.  We agree with Professor LaFave and decline to put much weight in the alleged safety rationale.

The remaining interest cited by the United States Supreme Court for warrantless inventory searches is the benign purpose of assisting the owner in the protection of variables.  *See Opperman*, 428 U.S. at 369–70, 96 S. Ct. 3097.  According to this rationale, the police inventory the contents of a vehicle for the benefit of the owner or operator of the vehicle to protect the owner's property.  *See id.*  Of course, if the risk of theft is at best insubstantial, the benefit to the owner is also at best insubstantial.  Further, we doubt that many motorists would regard a thorough inventory search as something helpful.  If the warrantless inventory search is really for the benefit of the owner or driver, law

enforcement should not object to allowing an owner the option to opt out of the state's beneficence. *See, e.g.*, *Virgil*, 268 Cal. App. 2d at 132; *Miller*, 403 So. 2d at 1314; *Fortune*, 689 P.2d at 1203. Further, if the warrantless inventory search is for the benefit of the owner, there should be no difficulty with the notion that the owner or driver should have the option to make alternate arrangements to protect property in the vehicle or consent to the warrantless search. *See Williams*, 689 P.2d at 1071.

5. *Status of warrantless inventory searches under article I, section 8 of the Iowa Constitution.* With respect to the decision to impound, there is merit to the notion that the police should explore alternative arrangements short of impoundment. This was our approach in *Kuster*, 353 N.W.2d 428. If the police goal is truly not investigative but to protect property and avoid false claims, the owner or driver of the vehicle should have the ability to opt for alternatives that do not interfere with public safety other than police impoundment. These options could include park-and-lock options on nearby streets or parking lots or calling a friend or third party to drive the vehicle away. Impoundment of a vehicle should be permitted only if these options have been adequately explored. This is the view endorsed by Professor LaFave. 3 LaFave, *Search and Seizure* § 7.3(c), at 820.

In addition, where impoundment is necessary, the next question is whether the police may conduct an inventory search of the vehicle and, if so, what is its scope. First, when impoundment is contemplated, law enforcement should ask the driver whether there is any property in the vehicle the driver wishes to retain. If so, the driver should be allowed to retrieve it. Second, with respect to property left behind, law enforcement may ask the driver whether there is anything of value requiring

safekeeping and make a record of the response in order to protect law enforcement from a later claim of theft of valuables.

Absent specific consent to search them, however, police must inventory closed containers left behind in the vehicle as a unit, an approach that vindicates the policies of protecting property and avoiding false claims. *See Hite*, 338 P.3d at 809; *Wisdom*, 349 P.3d at 965. It is important to note, however, that to the extent that consent is a factor, it should not be pursuant to an open-ended, multifactored *Schneckcloth* test. *See* 412 U.S. at 227, 93 S. Ct. at 2047–48. Such an approach should be anathema to those who favor "bright line" approaches. Instead, any consent must follow *Zerbst* to be knowing and voluntary. 304 U.S. at 464, 58 S. Ct. at 1023. Specifically, the police should advise the owner or operator of the options to impoundment; personal items may be retrieved from the vehicle; and if the vehicle is impounded, containers found within the vehicle will not be opened but stored for safekeeping as a unit unless the owner or operator directs otherwise.

None of these requirements for warrantless inventory search and seizure occurred in this case. Even if it could be argued that in light of the registration problems, the police were entitled to seize the car, the scope of the search, however, which included a search of the black bag— a closed container—was impermissible under the principles outlined above absent a knowing and voluntary consent. As a result, the motion to suppress in this case should have been granted because the warrantless inventory search violated article I, section 8 of the Iowa Constitution.

We note that our holding in this case does not mean that a warrantless impoundment of a vehicle is never appropriate. The state may develop a policy on impoundment and inventory searches consistent

with the constitutional requirements embraced in this opinion. For example, a policy might provide that the police may impound a vehicle when the motorist agrees to such impoundment and has had an opportunity to retrieve his or her belongings. And a policy might provide for impoundment of vehicles when the motorist is not present to give consent. Under these circumstances, law enforcement may implement a policy that allows officers to properly secure closed containers found in plain view at the police station. The impoundment and search in this case, however, was outside the bounds of any constitutionally permissible local impoundment and inventory policy.

### V. Conclusion.

For the above reasons, we reverse the ruling of the district court denying the motion to suppress and remand the matter to the district court.

**REVERSED AND REMANDED.**

Cady, C.J., Wiggins and Hecht, JJ., concur. Cady, C.J., files a separate concurring opinion. Mansfield, J., files a separate concurring opinion in which Waterman and Zager, JJ., join.

**CADY, Chief Justice (concurring specially).**

I concur in the majority opinion and the holding that closed containers located in an impounded vehicle may not be opened by police solely for the purpose of inventorying the contents, absent consent by the owner or operator.

As this case illustrates, the problem with the inventory search doctrine is it gives law enforcement officers free rein to conduct a warrantless investigatory search and to seize incriminating property, despite the doctrine's genesis as a means of protecting private property, guarding against false theft claims, and protecting officers from potential harm. *See South Dakota v. Opperman*, 428 U.S. 364, 369–70, 96 S. Ct. 3092, 3097 (1976). Yet, the three rationales that have allowed police to inventory the personal property located in an impounded vehicle may also be upheld by applying the more balanced doctrines of consent, plain view, *Terry*,[6] and probable cause. Indeed, officers may protect private property by invoking the consent exception, and officers concerned about safety when handling requested items within a vehicle may apply the existing doctrines of plain view, *Terry*, and probable cause that currently exist to protect police in all encounters with citizens. This approach strikes a better balance between the interests of citizens and the needs of government.

---

[6]*See Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1808, 1883 (1968).

**MANSFIELD, Justice (concurring specially).**

I concur in the result only. I would decide this case under established Fourth Amendment law rather than under a new interpretation of article I, section 8 of the Iowa Constitution.

In the present case, law enforcement conducted a roadside inventory search of an impounded vehicle and found methamphetamine and a glass pipe inside a drawstring cloth bag on the floorboard by the gas pedal. I would find this search did not comply with Fourth Amendment standards. The State failed to offer any evidence of an inventory search policy regarding closed containers and thus fell short of what the United States Supreme Court required, unanimously, in *Florida v. Wells*, 495 U.S. 1, 4–5, 110 S. Ct. 1632, 1635 (1990).

## I. The Inventory Search Violated the Fourth Amendment.

In *Wells*, the Court found the opening of a locked suitcase stored in a trunk pursuant to an inventory search violated the Fourth Amendment. *Id.* at 2, 5, 110 S. Ct. at 1634–35. Critically, "the record contained no evidence of any Highway Patrol policy on the opening of closed containers found during inventory searches." *Id.* at 3, 110 S. Ct. at 1634. The Court went on,

> Our view that standardized criteria, or established routine, must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime."

*Id.* at 4, 110 S. Ct. at 1635 (citations omitted) (quoting *Colorado v. Bertine*, 479 U.S. 367, 376, 107 S. Ct. 738, 743 (1987) (Blackmun, J., concurring)).

We have not had difficulty applying *Wells* in the past. *See, e.g., State v. Huisman*, 544 N.W.2d 433, 440–41 (Iowa 1996) (upholding an inventory search conducted under a standard policy which stated that "[a]ll vehicles impounded at the direction of a member of the Department will be fully inventoried, and the proper Impound Form will be prepared. This includes all containers which may hold valuables or other personal property, even if closed"); *State v. Jackson*, 542 N.W.2d 842, 845–46 (Iowa 1996) (upholding an inventory search under the Fourth Amendment where there was "ample, uncontroverted testimony that the patrol department in the present case had standardized inventory criteria that included opening all locked and unlocked containers and inventorying the containers' contents"). We can apply *Wells* today.

The majority recites the facts correctly, though with insufficient detail for my purposes. On October 30, 2015, around 6:30 a.m., Jasper County Deputy John Burdt was stationed in his patrol car along Highway 14 in Newton. He had received a report of a vehicle being driven recklessly. As the vehicle passed, Deputy Burdt noticed its rear license plate was not illuminated. Deputy Burdt initiated a stop for this traffic violation.

While making the stop, Deputy Burdt determined the vehicle's registration sticker did not match its license plate and the plate had expired in 2013. The driver, Bion Ingram, was also unable to produce a copy of the registration or proof of insurance for the vehicle. Deputy Burdt informed Ingram, who was on his way to work, that the vehicle

was going to be impounded and towed due to the improper use of a registration.

Deputy Burdt did not arrest Ingram. Instead, he offered to give him a ride to the nearest gas station so he could be picked up and taken to work. Ingram accepted this arrangement and called for a ride on his cell phone. Ingram asked about getting his work tools out of the vehicle. Deputy Burdt informed Ingram this could be done after the citations were completed.

Meanwhile, Newton Police Officer Bernard Eckert had arrived on the scene. Deputy Burdt informed Ingram that the vehicle was going to be inventoried and inquired if there was anything in it of high value "as a protection to all individuals involved." Ingram said there wasn't.

Because Deputy Burdt wanted Ingram to be able to get to work as quickly as possible, Deputy Burdt asked Officer Eckert to remove the license plates and perform an inventory of the vehicle while Deputy Burdt worked on the citations.

Officer Eckert completed his inventory on a Newton Police Department form. The form had spaces to fill in the name of the officer performing the inventory; the date, place, and time of the inventory; descriptive information on the vehicle; the names and addresses of the owner and the driver;[7] and the locations where the vehicle was being secured and where the keys would be. The inventory form also had spaces for listing "items of value." Additionally, there were spaces to list "criminal evidence found," the "location" where each item of such evidence had been found, and where the evidence had been subsequently "placed."

---

[7]The vehicle was owned by Ingram's girlfriend.

In the course of the inventory, Officer Eckert found a drawstring cloth bag on the floorboard of the driver's seat by the gas pedal. The bag was of a size that could have contained a small gun or valuables. Instead, it held a glass pipe and what a field test determined to be approximately one gram of methamphetamine. Officer Eckert wrote down these items under "criminal evidence found." On the inventory form, he also identified a "power converter" and "various tools" as "items of value."

Deputy Burdt testified at the suppression hearing. His testimony indicated the Jasper County Sheriff's Office has "an actual manual or policy on inventorying towed vehicles." However, the policy itself was not introduced into evidence. Instead, Deputy Burdt explained,

> It's common policy—or common any time a vehicle is towed that we do a vehicle inventory for documentation of the vehicle being towed, where it's going, what's the contents of the vehicle, and where—where is it being towed to.

Notably, no evidence was presented that the sheriff's office policy addressed closed containers either directly or by implication.

Furthermore, Officer Eckert of the Newton Police Department was the one who actually performed the inventory using the police department's form. Officer Eckert did not testify at the suppression hearing. No evidence was presented at the suppression hearing as to the Newton Police Department's inventory search policy, let alone as to a policy regarding closed containers.

In *Wells*, the Court emphasized there had to be an actual policy on closed containers. 495 U.S. at 4–5, 110 S. Ct. at 1635. The search there was invalid because the policy manual that had been introduced into evidence "fail[ed] to address the question." *State v. Wells*, 539 So. 2d 464, 469 (Fla. 1989) (discussing the contents of the policy manual that

made "no mention of opening closed containers"); *see also Wells*, 495 U.S. 5, 110 S. Ct. at 1635 (indicating "absent such a policy, the instant search was not sufficiently regulated").[8]

The State has the burden of proving that a warrantless search falls within a recognized exception. *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011). What the State presented here fell substantially short of the level of proof required in *Wells*. Deputy Burdt's testimony was—if anything—less specific than the manual provision deemed unsatisfactory in *Wells*. *See Wells*, 539 So. 2d at 469 (noting the manual required "an [i]nventory of all articles in the vehicle . . . such as articles of clothing, equipment and tools" (second alteration in original)). Deputy Burdt's testimony established only that the inventory covered "the contents of the vehicle." This simply restates what an "inventory" is and neither states nor implies anything about closed containers. Moreover, the inventory was actually conducted by an officer belonging to a different law enforcement agency, and there was no evidence as to the policy he followed.

Thus, I would simply find the opening of the cloth bag as part of the inventory search of the vehicle violated the Fourth Amendment. *See Tyler v. State*, 185 So. 3d 659, 661, 663–64 (Fla. Dist. Ct. App. 2016) (invalidating the search of a suitcase in a trunk during an inventory search where "the state provided no evidence of the department's inventory policy, other than the officer's testimony that one existed and that the contents of the impounded vehicle were required to be inventoried and logged for liability purposes"); *Sams v. State*, 71 N.E.3d

---

[8]The Florida Supreme Court's decision was affirmed on appeal by the United States Supreme Court in *Wells*, 495 U.S. 1, 110 S. Ct. 1632.

372, 375, 378–79, 383 (Ind. Ct. App. 2017) (overturning an inventory search of a fast-food bag and a hamburger box where the written policy was to "list all personal property" whereas the practice in the field was to look for anything "valuable," thus resulting in too much discretion); *State v. Baker*, 395 P.3d 422, 428 (Kan. 2017) ("The failure to present any evidence of standardized criteria or an established routine governing the opening of closed containers during inventory searches is fatal to the State's inevitable discovery claim."); *People v. Mead*, 908 N.W.2d 555, 563–64 (Mich. Ct. App. 2017) (noting the search of a backpack in a vehicle was not justified as an inventory search because the officer merely "testified that he searches vehicles to 'check for valuables or any damage to the vehicle, anything that may be in there' " but "offered no further explanation of police department policies, did not explain department policy for the search of a container, and did not explain how his search complied with department policy"); *Commonwealth v. West*, 937 A.2d 516, 529 (Pa. Super. Ct. 2007) (determining an inventory search that uncovered cocaine in a motorcycle seat was invalid because "the suppression transcript simply [did] not contain testimony showing the department had in place and employed a standard, reasonable policy when searching the vehicle" and when "[t]he Commonwealth had the burden to demonstrate the particulars of that policy and to show the search was done in accordance therewith"); *State v. Molder*, 337 S.W.3d 403, 410 (Tex. Ct. App. 2011) (finding the search results should be suppressed where the state failed to introduce the actual inventory policy and "Trooper Gillum's concise testimony establishe[d] that [the department of public safety] ha[d] a general policy to inventory vehicles associated with defendants' arrests, but the testimony relate[d] nothing

about the scope of the policy or how it affect[ed] closed containers such as appellee's roped blue bag"). I would end the opinion at this point.

## II. The Majority's Iowa Constitutional Analysis Is Flawed.

Instead of following the foregoing path, which seems to me not in the least difficult to follow, the majority decides to "stake out higher constitutional ground" and "restore the balance between citizens and law enforcement." As it is the end of our term, I will not debate these broader themes with the majority. But I will explain where I disagree with the substance of the majority's ruling.

First, I do not believe the majority's ruling will promote "stability and finality in law." Instead, it will create uncertainty and unneeded burdens.

Take Deputy Burdt's decision to impound the vehicle. I thought that was an easy call in this case. The vehicle had no valid registration and could not be legally driven. Nor could it be left where it was on the side of the highway. However, the majority now requires that "the owner or driver . . . have the ability to opt for alternatives other than police impoundment that do not interfere with public safety." So the first thing law enforcement must do is develop a list of options and provide it to the motorist. What options? For example, must the motorist be offered the chance to arrange his or her own tow? Does law enforcement need to wait around while this is happening? Suppose the motorist says, "I don't know what to do about the vehicle. You should check with the owner." What if the motorist is being arrested? What if law enforcement wants to impound the vehicle and consult with the county attorney's office on whether a warrant is appropriate? What if no driver is present?

Next, the contents of the vehicle. The majority says the driver should have the opportunity to retrieve items from the vehicle. This

means, of course, the officer must wait while items are retrieved. But again, what if the driver is being arrested or asks to check with the owner? Can the officer watch while items are being retrieved? If not, what about the officer's safety?

Regarding closed containers, the majority indicates not only that they may not be opened, but also that the motorist must be *told* they won't be opened "but stored for safekeeping as a unit unless the owner or operator directs otherwise." Does this mandatory disclaimer prevent law enforcement from getting a warrant?

Law enforcement needs clear rules, not elaborate, partly developed decision trees. We should not be converting roadside stops into episodes from Plato's *Dialogues*. Respectfully, I believe the *Wells* standard works better than the majority's approach.

Second, despite what the majority may suggest, its approach is not supported by constitutional precedents from other states. The majority directs us to precedents from Indiana, New Jersey, Oregon, South Dakota, Texas, and Washington.

In reality, three of those six states do not now limit closed container searches when conducted pursuant to a bona fide inventory search policy. The majority has this caselaw wrong.

The Indiana Court of Appeals in *State v. Lucas* did invalidate the search of a locked box under both the state and federal constitutions. 859 N.E.2d 1244, 1251 (Ind. Ct. App. 2007). However, this ruling was not based on a blanket prohibition against opening closed containers but instead on the fact that the inventory policy was silent on the issue of locked boxes. *Id.* at 1250–51. In *George v. State,* the court concluded that a search of the contents of a pill bottle found in a lidless condom box was permissible. 901 N.E.2d 590, 592, 597 (Ind. Ct. App. 2009).

Also, South Dakota has backed down from its earlier views on inventory searches. Under the South Dakota Constitution, "so long as there is a good faith, noninvestigatory inventory search conducted pursuant to reasonable, standardized and uniform policies, it need not be restricted to articles which are within the plain view of the officers' vision." *State v. Flittie*, 425 N.W.2d 1, 5–6 (S.D. 1988); *see also State v. Hejhal*, 438 N.W.2d 820, 821–22 (S.D. 1989) (holding the inventory search of the wallet was conducted according to "reasonable[,] standardized[,] and uniform policies").

In *Autran v. State*, a plurality of the Texas Court of Criminal Appeals found that the inventory search of the contents of a vehicle's trunk—including a box containing large sums of money and drug residue—violated the Texas Constitution but not the Fourth Amendment. 887 S.W.2d 31, 33, 36, 42 (Tex. Crim. App. 1994) (en banc) (plurality opinion). The plurality noted its decision was "not to say that officers may never search a closed or locked container, only that the officers may not rely upon the inventory exception to conduct such a warrantless search." *Id.* at 42.

Only two years later, though, another Texas appellate court "decline[d] . . . to follow the plurality opinion in *Autran* because [it did] not believe that *Autran* constitutes either binding precedent or sound law." *Hatcher v. State*, 916 S.W.2d 643, 645 (Tex. Ct. App. 1996). The court thus concluded that the state constitution does *not* afford greater rights than the Fourth Amendment in this area and therefore determined that the inventory search of the defendant's closed container—in this instance, her purse—did not violate her constitutional rights. *Id.* at 644, 646; *see also Hankston v. State*, 517 S.W.3d 112, 120 (Tex. Crim. App. 2017) (rejecting the reasoning of the *Autran* plurality and instead finding

the court was "free to adopt the Supreme Court's interpretation of the Fourth Amendment, and apply it in this case, simply because it 'makes more sense'" (quoting *Crittenden v. State*, 899 S.W.2d 668, 673 (Tex. Crim. App. 1995) (en banc))).

Two other states cited by the majority appear not to forbid *all* opening of closed containers but focus on the type of container. In *State v. Hite*, the Oregon Court of Appeals overturned an inventory search of a backpack, not because of a strict rule against searches of closed containers, but because the backpack was "*not* designed to contain or objectively likely to contain valuables or even dangerous items." 338 P.3d 803, 811 (Or. Ct. App. 2014). Later, in *State v. Cleland*, the same court upheld an inventory search of a black nylon case that appeared to be designed for holding small electronics. 410 P.3d 386, 387–88 (Or. Ct. App. 2017).

In *State v. Wisdom*, the Washington Court of Appeals found that the opening of a defendant's shaving kit under an inventory search was a violation of the defendant's state constitutional rights. 349 P.3d 953, 955, 965 (Wash. Ct. App. 2015). The court's focus, though, was on the nature of the container and not whether it was open or closed:

> A person does not rummage through a woman's purse, because of secrets obtained therein. A man's shaving kit bag can be likened to a woman's purse. The kit bag could obtain prescription drugs, condoms, or other items the owner wishes shielded from the public. The bag is intended to safeguard the privacy of personal effects. Literature, medicines, and other things found inside a bag may reveal much about a person's activities, associations, and beliefs.

*Id.* at 961.

A cloth drawstring bag is the type of container that often *does* contain valuables, such as jewelry or money, but usually *does not* contain personal or health information. I am not persuaded that

Oregon—or perhaps Washington—would forbid inventorying the contents of such a bag pursuant to an otherwise valid inventory search policy.

This leaves New Jersey as the remaining jurisdiction discussed by the majority. New Jersey departs from federal precedent but uses a balancing test under the state constitution that considers "the scope of the search, the procedure used, and the availability of less intrusive alternatives." *State v. Hummel*, 179 A.3d 366, 373 (N.J. 2018) (quoting *State v. Mangold*, 414 A.2d 1312, 1317 (N.J. 1980)). Whatever the merits of this approach, it differs considerably from the approach taken by the majority today.

Nor can the majority find nourishment in pre-*Wells* Iowa caselaw. *State v. Roth* upheld the inventory search that included the opening and examination of the contents of a bag. 305 N.W.2d 501, 507–08 (Iowa 1981). In *State v. Kuster*, our court struck down the impoundment of a *vehicle* that had been locked and legally parked. 353 N.W.2d 428, 432 (Iowa 1984), *overruled by Huisman*, 544 N.W.2d at 440. Here, however, the vehicle was not legally parked and could not have been legally driven.

Inventory searches are subject to abuse. Thus, it is important to limit law enforcement discretion in this area. Everyone agrees on this point. The relevant question, though, is how to limit that discretion. I think *Wells* is a sounder approach than the majority's. It allows law enforcement to develop the policy, so long as it an actual policy, rather than having nonexpert judges develop the policy. I've already discussed what I believe to be the practical flaws in the majority's approach.

Overall, I think the majority understates the legitimate need for inventory searches, understates the willingness of defendants to make false claims of missing property, and understates the potential risk to

law enforcement of transforming vehicle impoundments into lengthy, interactive Q-and-A sessions.

### III. Conclusion.

I would reverse the denial of Ingram's motion to suppress without embarking on a novel interpretation of article I, section 8 of the Iowa Constitution.[9]

Waterman and Zager, JJ., join this special concurrence.

---

[9]I do not follow why the majority believes it need not reach the sufficiency of the evidence to sustain Ingram's conviction. In my view, the evidence of guilt was sufficient, although as a practical matter the reversal of the ruling on the motion to suppress may end this case.